Case No: 14-2063

# TENTH CIRCUIT COURT OF APPEALS

Phillip Mocek,

     Plaintiff - Appellant,

v.

City of Albuquerque, Albuquerque Aviation Police
Department, Marshall Katz, in his official capacity
as Chief of Police of the Albuquerque Aviation
Police Department, Jonathan Breedon, Gerald Romero,
Anthony Schreiner, Robert F. Dilley, a/k/a Bobby
Dilley, Landra Wiggins, Julio De La Pena, and Does
1-25, inclusive,

     Defendants-Respondents,

## APPELLANT'S OPENING BRIEF

Appeal From: United States District Court for the District of New Mexico
Trial Judge: James O. Browning, U.S. District Judge
District Court Case No: 11-1009-JB-KBM

William Simpich
Attorney at Law
Law Office of William Simpich
1736 Franklin Street, Tenth Floor
Oakland, CA 94612
Telephone: (510) 444-0226

James R. Wheaton
Cherokee Melton
First Amendment Project
1736 Franklin Street, Ninth Floor
Oakland, CA 94612
Telephone: (510) 208-7744

Mary Louise Boelcke
P.O. Box 31033
Albuquerque, NM 87190
Telephone: (505) 804-1632

Attorneys for Plaintiff-Appellant, Phillip Mocek

ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES — i

STATEMENT OF PRIOR OR RELATED APPEALS — vi

CORPORATE DISCLOSURE STATEMENT — vii

JURISDICTIONAL STATEMENT — 1

STATEMENT OF THE ISSUES — 1

STATEMENT OF THE CASE — 3

STATEMENT OF THE FACTS — 5

SUMMARY OF THE ARGUMENT — 22

ARGUMENT — 24

INTRODUCTION — 24

I. MOCEK PLED SUFFICIENT FACTS TO STATE
A CLAIM OF FIRST AMENDMENT RETALIATION — 25

A. STANDARD OF REVIEW — 25

B. Mocek was Engaged in Constitutionally
Protected Activity — 27

C. Defendants' Actions Caused Mocek to Suffer
an Injury That Would Chill a Person of Ordinary
Firmness — 29

D. Defendants' Adverse Actions Were Motivated by
Mocek Filming — 32

II. DEFENDANTS ARE NOT ENTITLED TO
QUALIFIED IMMUNITY ON MOCEK'S FIRST
AMENDMENT CLAIM                                                    33

A. Defendants Violated a Clear Constitutional Right                34

B. The Defendants' Retaliatory Actions were
Unreasonable                                                       34

C. The Right to Gather News Was Clearly Established                38

III. DEFENDANTS VIOLATED PLAINTIFF'S
FOURTH AMENDMENT RIGHTS                                            41

A. Standard of Review                                              41

B. The City Defendants conducted a pretextual arrest
and search                                                         42

1. This conduct was clearly pretextual                             42

2. Plaintiff did not refuse to provide ID - he had no ID
in his possession                                                  43

3. Plaintiff provided his identity to TSA, right on his
boarding pass                                                      44

4. The arrest and search of Plaintiff cannot be justified
on a pretextual basis                                              45

5. These facts also support Plaintiff's claim for abuse
of process                                                         46

C. Even if there were no pretext, City defendants would
still be liable for the 4th Amendment violations                   47

1. Mocek's conduct was non-disruptive and is protected
in the airport screening context                                   47

2. Mocek followed the law, while Dilley lied in his report         49

3. Dilley and the other defendants worked together in
dreaming up the four criminal counts                               50

IV. DEFENDANTS ARE NOT ENTITLED TO
QUALIFIED IMMUNITY FOR THE FOURTH
AMENDMENT VIOLATIONS                                              51

V. MUNICIPAL LIABILITY CLAIM SHOULD
PROCEED, AS UNCONSTITUTIONAL ACTS
ALLEGED                                                          52

VI. DECLARATORY RELIEF CLAIM SHOULD
GO FORWARD, AS CASE IS NOT MOOT                                  53

VII. PLAINTIFF SEEKS LEAVE TO AMEND
THE COMPLAINT                                                    54

VIII. PLAINTIFF REQUESTS APPOINTMENT
OF A NEW DISTRICT COURT JUDGE                                    55

CONCLUSION                                                       55

REQUEST FOR ORAL ARGUMENT                                        57

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

CERTIFICATE OF DIGITAL SUBMISSION

CERTIFICATE OF SERVICE

ADDENDA

## TABLE OF AUTHORITIES

**Page**

*Am. Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d
583 (7th Cir. 2012)                                                        28

*Ashcroft v. al-Kidd*, 131 S. Ct. 2074  (2011)                             23,39

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)                              26

*Barber v. City of Salem, Ohio*, 953 F.2d 232. (6th Cir. 1992)             53

*Bell Atlantic v. Twombly*, 550 U.S. 544 (2007)                            30

*Bd. of Airport Comm'rs of City of Los Angeles v. Jews for
Jesus, Inc.*, 482 U.S. 569 (1987)                                          34

*Berg v. County of Allegheny*, 219 F.3d 261 (3d Cir.2000)                  31

*Blackstone v. Alabama*, 30 F.3d 117 (11th Cir. 1994)                      34

*Bose Corp. v. Consumers Union of United States, Inc.*,
466 U.S. 485 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984)                      25

*Branzburg v. Hayes*, 408 U.S. 665, (1972)                                 27

*Burstyn v. Wilson*, 343 U.S. 495 (1952)                                   28

*Citizens United v. FEC*, 558 U.S. 310 (2010)                             28,35

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983)                         53

*DeLoach v. Bevers*, 922 F.2d 618 (10th Cir. 1990)                         27

*First Nat'l Bank v. Bellotti*, 435 U.S. 765 (1978)                        27,39

*Fleetwood Retail Corp. of N.M. v. LeDoux*, 142 N.M.
150 (2007)                                                                24,47

*Fordyce v. City of Seattle,* 55 F.3d 436 (9th Cir.1995)                   29

*Gayle v. Gonyea*, 313 F.3d 677 (2nd Cir.2002)                             33

i

*Geter v. Fortenberry*, 849 F.2d 1550 (5th Cir. 1988)     46

*Gilles v. Davis*, 427 F.3d 197 (3d Cir. 2005)     40

*Glik v. Cunniffe,* 655 F.3d 78 (1st Cir. 2011)     29

*Globe Newspaper Co. v. Super. Ct.*, 457 U.S. 596 (1982)     27

*Hannon v. Beard,* 645 F.3d 45, 49 (1st Cir.2011)     33

*Hiibel v. New Mexico*, 542 US 177 (2004)     49,52

*Houchins v. KQED, Inc.*, 438 U.S. 1 (1978)     27

*Hunt v. Bennett*, 17 F.3d 1263, 1265 (10th Cir. 1994)     53

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 115 S. Ct. 2338, 132 L. Ed. 2d 487 (1995)     26

*Hunter v. Bryant*, 112 S.Ct. 534     51

*Int'l Soc. For Krishna Consciousness, Inc., v. Lee*, 505 U.S. 672 (1992)     34

*Journal Pub. Co. v. Mechem*, 801 F.2d 1233 (10th Cir. 1986)     23

*Klen v. City of Loveland, Colo.*, 661 F.3d 498, (10th Cir. 2011)     26

*Kolender v. Lawson*, 461 US 352, 360 (1983).     23,49

*Lee v. Int'l Soc. For Krishna Consciousness, Inc.*, 112 S.Ct. 2709 (1992)     34,35

*Malley v. Briggs*, 475 U.S. 335, n. 7 (1986)     31

*Marland v. Heyse*, 315 F.2d 312 (10th Cir. 1963)                48

*Medina vs. City and County of Denver*, 960 F.3d
1493 (10th Cir. 1992)                                            24

*Meese v. Keene*, 481 U.S. 465 (1987)                            54

*Medina vs. City and County of Denver*, 960 F.3d
1493 (10th Cir. 1992)                                             3

*Mills v. Alabama,* 384 U.S. 214 (1966)                          29

*Minneapolis Star & Tribune Co. v. Minnesota
Comm'r of Revenue*, 460 U.S. 575 (1983)                          36

*Monroe v. Pape*, 365 U.S. 167 (1961)                            31

*New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.
Ct. 710, 11 L. Ed. 2d 686 (1964).                                26

*Pell v. Procunier,* 417 U.S. 817 (1974)                         29

*Pollack v. Reg'l Sch. Unit* 75, 2:13-CV-
00109-NT, 2014 WL 1321118. (D. Me. Mar.
31, 2014)                                                        33

*Revo v. Disciplinary Bd. of the Supreme Court*, 106
F.3d 929 (10th Cir.1997).                                        25

*Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555            27

*Robinson v. Fetterman*, 378 F.Supp.2d 534 (E.D. P.A.
2005)                                                          38,41

*Romero v. Fay*, 42 F.2d 1472 (10th Cir. 1995)                 51,52

*Rosenberger v. Rector and Visitors of Univ. of Virginia*,
515 U.S. 819 (1995)                                              38

*Santillo v. N.M. Dep't of Public Safety*, 143 N.M. 84
(Ct.App. 2007)                                                 24,46

*Secretary of State of Maryland v. Joseph H. Munson Co.*,
467 U.S. 947 (1984)                                                    24

*Sevigny v. Dicksey*, 846 F.2d 953 (4th Cir. 1988)                     47

*Smith v. City of Cumming*, 212 F.3d 1332 (11th Cir. 2000)             28

*Smith v. Plati*, 258 F.3d 1167 (10th Cir. 2001)                       29

*Soc'y of Separationists v. Pleasant Grove City*,
416 F.3d 1239, (10th Cir. 2005).                                       3,54

*Tobey v. Jones*, 706 F.3d 379 (4th Cir. 2013)                         30,47

*United States v. Abel*, 362 US 217 (1960)                             45

*United States v. Karam*, 4963d 1157 (10th Cir. 2007)                  42

*United States v. Kokinda*, 497 U.S. 720 (1990)                        34

*United States v. Pearl*, 944 F. Supp. 51 (D. Me. 1996)                45

*United States v. Sherman*, 581 F.2d 1358 (9th Cir. 1978)              27

*Winters v. Board of County Commissioners*, 4 F.3d 848
(10th Cir. 1993                                                        45

*Worrell v. Henry*, 219 F.3d 1197 (10th Cir.2000)                      26

*York v. City of Las Cruces,* 523 F.3d 1205 (10th Cir. 2008)           39

iv

**Statutes:**

28 U.S.C. 1291 — 1

28 U.S.C. 1331 — 1

28 U.S.C. 1332 — 1

28 U.S.C. 1343 — 1

28 U.S.C. 1367 — 1

28 U.S.C. 1983 — 1

28 U.S.C. 2201 — 1

**U.S. Constitution:**

First Amendment — 25-41

Fourth Amendment — 41-52

## STATEMENT OF PRIOR OR RELATED APPEALS

There have been no prior appeals in this case. There are no related appeals or prior state court matters relevant to the instant appeal.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellant submits the following corporate disclosure statement: Appellant Phillip Mocek is an individual. He does not have a parent corporation or any publicly held corporation that owns 10% or more of its stock.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 42 U.S.C. Section 1983 and 28 U.S.C. Section 1331. It granted two separate motions to dismiss, with the later motion disposing of all remaining claims. App.134, 386. Plaintiff timely filed his appeal April 28, 2013. App.522. Plaintiff seeks review of the dismissal of his case by the District Court. This Court has jurisdiction to hear the appeal under 28 USC Sections 1331-1332 (federal question and diversity), 28 USC Section 1343 (civil rights), 28 USC 1367 (supplemental state law claims) and 28 USC 2201 (declaratory relief). This court has jurisdiction under 28 U.S.C. Section 1291.

## STATEMENT OF THE ISSUES

1. Did Plaintiff Plead Sufficient Facts to State a Claim of First Amendment Retaliation?

2. Are Defendants Entitled to Qualified Immunity on This Claim?

3. Did Defendants Violate Plaintiff's Fourth Amendment Rights?

4. Are Defendants Entitled to Qualified Immunity on this Claim?

5. Should the Municipal Liability Claim Proceed, as Plaintiff Set Forth Legally Cognizable Rights in the Complaint?

6. Should the Declaratory Relief Claim Proceed, due to the First Amendment Nature of the Claim?

7. Should the Malicious Abuse of Process Claim Proceed, as it was Not

1

Briefed by Defendants?

8.  Should Plaintiff Be Granted the Right to Amend the Complaint?

9.  Should a New District Court Judge Be Appointed in this Case

The law in these areas is clear and does not permit a grant of qualified immunity.  The law is clearly established that Plaintiff was engaged in news and information gathering, a First Amendment-protected activity of all citizens. *Journal Pub. Co. v. Mechem*, 801 F.2d 1233, 1236 (10th Cir. 1986).  The clearly established inquiry does not require a fact pattern "directly on point".  *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011).

The Defendants' response to Plaintiff's exercise of this right was to halt this activity and arrest him without a reasonable basis to believe that probable cause existed.  City Defendant Dilley arrested Plaintiff for not providing "credible and reliable information" in the course of an unjustified *Terry* stop that went beyond the bounds of the original reason for the stop.  It is clearly established law that the Supreme Court has barred demands for I.D. even when reasonable facts exist. *Kolender v. Lawson*, 461 US 352, 360 (1983).  Because the Court's ruling was dispositive of the outcome, it constitutes reversible error. As unconstitutional policies, practices and conduct are properly alleged, Plaintiff's municipal liability claim should go forward.  If any of these acts are protected by qualified immunity,

2

a cause of action against that municipal defendant would still be valid. *Medina vs. City and County of Denver*, 960 F.3d 1493 (10th Cir. 1992)

Plaintiff's declaratory relief claim should go forward. Where a plaintiff's right to free speech has been infringed in the past, the chilling effect on free speech is deemed to be a sufficient continuing injury to merit standing to enjoin the unconstitutional statute or policy. See *Secretary of State of Maryland v. Joseph H. Munson Co.,* 467 U.S. 947, 956-957 (1984)

As Defendants never briefed the malicious abuse of process claim, it should be remanded to the Court.    Plaintiff set forth an adequate claim. See, e.g., *Santillo v. N.M. Dep't of Public Safety*, 143 N.M. 84 (Ct.App. 2007); *Fleetwood Retail Corp. of N.M. v. LeDoux*, 142 N.M. 150, 159 (2007).    Plaintiff should be permitted to amend the complaint. Challenges to a motion to dismiss are reviewed *de novo. Soc'y of Separationists v. Pleasant Grove City*, 416 F.3d 1239, 1240–41 (10th Cir. 2005).

## STATEMENT OF THE CASE

Plaintiff filed the Complaint on 11/14/11. App.8. Several of the defendants were employed by the Transportation Security Administration: Jonathan Breedon was lead transportation security officer; and Anthony Schreiner was supervisory transportation security officer, Gerald Romero was transportation security

manager. App.11-12. These Defendants are referred to herein as "the Federal

Defendants". The other defendants were the City of Albequerque, the Albequerque

Aviation Police Department, and its employees: Chief of Police Marshall Katz,

arresting officer Robert Dilley, and assisting officers Landra Wiggins and Julio de

la Pena. *Id.* These Defendants are referred to herein as "the City Defendants".

On 2/13/12, the City Defendants filed an Answer. App.35. On June 1,

2012, the Federal Defendants filed a Motion to Dismiss. App.51. Plaintiff filed an

Opposition to the Motion to Dismiss. App.85. Federal Defendants filed a

Reply. App.114. On 11/20/12, the hearing was held before the Hon.James O.

Browning. App.127. On 1/14/03, a 125-page order was issued, granting the

Federal Defendants' Motion to Dismiss without leave to amend. App.134.

On 2/1/03, the City Defendants filed a Motion to Dismiss. App.258.

Plaintiff filed an Opposition. App.292. City Defendants filed a Reply. App.339.

Plaintiff moved for judicial notice of Department of Justice's Statement of Interest

in the case of *Garcia v. Montgomery, MD.* App.366. On 7/12/13, the hearing was

held before the Hon. James O. Browning, and the court took judicial notice of the

Statement of Interest. App.381; App.447; App.618. The court also stated that he

would review the request to amend the complaint on the merits. App.447. On

9/30/13, an order was issued, granting the City Defendants' Motion to Dismiss

without leave to amend.  App.384.  A 134-page memorandum and order explaining

the basis for the dismissal was filed on 2/28/14.  App.386.

Final judgment was filed on 2/28/14.  App.519.  Notice of Appeal was filed

on 4/28/14.  App.522.

## STATEMENT OF FACTS

**In the past, Mocek has flown by commercial air without needing to provide documentation of identity**

Throughout most of his adult life, Phil Mocek has flown by commercial air

typically once or twice per year. On or around 2006, Mocek read about his

friends' experiences on commercial aircraft without presenting identity documents

("I.D.") to TSA staff at the airport. Mocek believed that the TSA's airline

passenger identification procedures were designed to facilitate a system of

restriction of movement based on government surveillance.  App.13.

Around 2007, Mocek started flying without showing I.D.  Mocek was

always careful to say that he did not have any I.D. for the TSA agent, never that

Mocek did not have any I.D. with him or that he did not want to present it.  *Id.*

During 2008, TSA's policy on airline passenger identification changed.

TSA announced via press release that passengers who "willfully refuse[d]" to

show I.D. would not be allowed past their checkpoint, but those whose I.D. was

merely "misplaced" or "stolen" would be allowed to pass through if they cooperated with alternative procedures.   App.14.

Plaintiff learned that starting Saturday, June 21, 2008, passengers that refused to provide identification at security checkpoint would be denied access to the secure area of airports. This change will apply exclusively to individuals that simply refuse to provide any identification or assist transportation security officers in ascertaining their identity.   This new procedure was not to affect passengers who otherwise do not have ID but were cooperative with officers.   Cooperative passengers without I.D. would face additional screening protocols.  App.14.

Mocek traveled to Albuquerque, New Mexico.  On November 15, 2009, Mocek intended to return to his home in Seattle by flying out of Albuquerque Airport. Mocek's Washington State driver's license was his only documentation of identity.  When Mocek arrived at the airport, he handed his driver's license to Jesse Gallegos, Mocek's friend and travel companion, who carried it from that time until Mocek later retrieved it from him.  App.17.

### Mocek learned that TSA, the state and the city had no laws or regulations prohibiting him from photographic activities at the airport

TSA communicated in writing to the public that there are no TSA prohibitions on photography, video recording, or filming at screening locations. "You can take pictures at our checkpoints as long as you're not interfering with the screening process or slowing things down." App.14-15.  Mocek did conduct

6

research into laws and regulations and determined that no state or local laws or regulations prohibited him from these activities at the Albuquerque airport, except possibly the TSA monitors. App.14-17. Mocek began using his camera at the airport when it became clear that Albuquerque TSA employees were subjecting him to an "atypical, alternative identification policy." App.17.

As Mocek had successfully flown without I.D. since 2007, he believed that if he attempted to fly without I.D., the typical TSA reaction would be to send him to a separate line to await assistance and additional questioning from a TSA employee. App.14.

### Mocek did not engage in disorderly or disruptive conduct

Mocek did not act disruptively during either the events leading to his arrest or while in custody. "Mocek in fact consistently used a calm, quiet tone of voice. Mocek did not yell at any TSA agents or law enforcement officers. Mocek did not yell 'I know my rights.'" App.23. Mocek's conduct even in declining to follow TSA's unlawful orders was "calm" and "restrained" in the face of <u>TSA agents' and law enforcement</u> officers' increasingly agitated behavior. App.9; App.23. There was no evidence that Mocek's behavior disturbed other passengers. "[V]ideo footage shows people walking by without any hesitation" and "the traveling public in general did not 'stop and take notice.'" App.23-24. The TSA's own written statements make no suggestion that Mocek caused any public disturbance.

7

App.26. At all times, Mocek never went through the security checkpoint and remained in publicly accessible areas of the airport. App.9; App.20.

### Mocek did not provide identification documents, filmed TSA and Albuquerque police officers, and was arrested

Mocek approached the podium where TSA agents were checking passenger documents.  TSA agent Greg Martinez asked for I.D. when Mocek presented his boarding pass.  Mocek answered that he did not have any form of ID, and that he understood that he was not required to produce documents other than his boarding pass. Martinez told Mocek to go stand in a different line nearby. Mocek waited as approximately four people ahead of him were processed.  App.17.

Defendant Jonathan Breedon, a TSA security agent, took Mocek's boarding pass and asked if Mocek had any other I.D. to help identify him.  Mocek said that he did not think he was required to provide ID. Breedon said Mocek was correct and asked if he could verify his identity in another way. Mocek again stated that he would not provide anything because it was his belief that he was not required to. Breedon notified Mocek that he would contact the TSA's Security Operations Center, which would try to verify Mocek's identity, and if they could not, Mocek would not be allowed to proceed through the security checkpoint. At this point in time, there was no indication from any of the TSA agents present that there was any intent to involve law enforcement.  App.17-18.

.    Mocek began using his camera to video record this manifestation of what he perceived to be an atypical, alternative identification policy. Breedon told him that no photography or videotaping was allowed at the security checkpoint. Mocek said that he did not believe that filming of a publicly accessible area was illegal. App.18.

Breedon called for police assistance. In the meantime, Defendants Anthony Schreiner, a TSA security supervisor, and Gerald Romero, a TSA manager, approached the security checkpoint area after Breedon summoned for assistance. Breedon briefed Schreiner on the events that just took place. App.18.

Romero ordered Mocek repeatedly to put down the camera and attempted to grab either Mocek or the camera. App.18.

Defendants Robert Dilley, Landra Wiggins, and Julio De La Pena, officers of the Albuquerque Aviation Police Department, arrived on the scene, and received a complaint from the TSA agents upon the law enforcement officers' arrival that Mocek would not put down his camera. When Dilley, the first to arrive, appeared on the scene, TSA agents described the encounter to the law enforcement personnel with the following phrases: "causing a disturbance," "he won't put his camera down, either", and that he was "taking pictures of all of us." App. 18-19.

Mocek's filming was the primary, if not the sole, cause for the events that followed, including his ultimate arrest. App.19.

Dilley told Mocek to comply with the TSA agents' instructions or else he would be escorted out of the airport. One of the officers said that Mocek was causing a commotion. Mocek said, "I haven't raised my voice. I'm not trying to stop you from doing your job." Mocek said that he intended to comply with all of the TSA's rules and regulations.  App.19.

Dilley told Mocek again to comply or he would be escorted out of the airport. Mocek reiterated that he did not believe there was a rule that barred him from using a camera in publicly accessible areas of the airport. Wiggins stated that this was a federal checkpoint and that Mocek could not film there. Mocek replied, "I've checked into it and I know that I can do it here." Wiggins said, "Well, you can be arrested, then you can check into it more."  App.19.

Wiggins said, "You're almost there. You pushin' it, okay? You're really pushin' it." After a moment's confusion, De La Pena remarked, "He don't want to show his I.D., either." Dilley said, "Let's go, sir. You're leaving the airport. You're being escorted out at this point. Let's go. And if you refuse, we'll arrest you. Let's go." Dilley then changed his mind about escorting Mocek out of the airport, stating that he was going to need to see Mocek's I.D. or else he was going to arrest Mocek for concealing his identity. App.19.

Mocek said that he did not have any I.D. to show Dilley.  App.19.

Dilley stated that Mocek was now a part of a criminal investigation and was required to give I.D. When Mocek asked what he was being investigated for, Dilley replied that it was for disturbing the peace. Mocek then said he was going to remain silent and that he wanted to talk to an attorney. Dilley said, "We're gonna end up arresting you. Come on, let's go. We're gonna search your property, and if we find I.D. on you—on your property, we will arrest you for concealing I.D." App.19.

Dilley subsequently said, "You're under arrest. You don't have no options. Let's go." Dilley placed Mocek under arrest without a warrant. Dilley did not state the reason for the arrest. App.20.

From the time Mocek arrived at the airport to his arrest, Mocek, having not gone through the security checkpoint, had fully remained within publicly accessible areas of the airport. App.20.

Dilley and Wiggins walked Mocek across the airport to the Aviation Police Department office. The officers locked Mocek in a small holding cell (about 4 × 8 feet in size). Next, the officers searched Mocek's belongings in the room just outside the cell door. Any items with his name on them were sealed in two envelopes. These included business cards, credit cards, and insurance cards. App.20.

Mocek was detained in this holding cell for about two hours. During this time, Dilley wrote an incident report while Wiggins went to Southwest Airlines to find out if Mocek had checked any luggage. Wiggins returned saying that Mocek had not checked any luggage. *Id.*

Dilley had some difficulty completing various forms without using Mocek's name. Nevertheless, Mocek was not asked to state his name while Dilley was filling out of the forms. Once Mocek was in the cell, however, Dilley asked Mocek if he wanted to identify himself, but at this point Mocek was unsure how to answer, as he did not want to do anything that he was not required to do, and it was entirely unclear whether he was required to identify himself. When Mocek tried to find out if he was required to identify himself, Dilley asked him to stop talking. *Id.*

Eventually, Mocek's concern about the possibility of violating any laws that required him to proactively identify himself outweighed his concern about speaking to those who were investigating him. Mocek stated clearly to Dilley and Wiggins, "My name is Phillip Anthony Mocek." Dilley told Mocek to stop talking. App.20-21.

Dilley told Mocek that the jail where he was going next would not accept his belongings, because he was being processed "as a John Doe." Instead, Mocek's belongings would be kept in safe storage at the Aviation Police Department office.

Dilley read a statement to Mocek and asked if he understood. Mocek's only

response was that he wished to remain silent.  App.21.

.    The officers then placed Mocek in handcuffs and walked him to a police car

outside. Dilley drove Mocek to the downtown police department. They did not

speak.  Mocek was brought out to stand in front of a counter while being searched,

and then returned to the cell. After Mocek was searched, Dilley left. *Id.*

Eventually, Mocek was brought to the Bernalillo County Metropolitan

Detention Center, where he was put in a large cell. Mocek was fingerprinted and

photographed and spoke with medics about his health. Someone in the room with

the medics gave Mocek a paper to sign, and when Mocek saw that the form stated

his name was John Doe, he told that person that there was a mistake and provided

his real name.  *Id.*

**City defendants write a false criminal complaint and false incident**

**reports**

Sometime after the arrest, Dilley authored a incident report and criminal

complaint filled with untruths.  According to the incident report, Mocek "caus[ed]

a disturbance by Disorderly Conduct," refused to identify himself, and "was finally

issued a Criminal Trespass Order which he refused to obey."  Dilley wrote that

Mocek refused to comply with instructions and that Mocek raised his voice to such

a level that it caused a disturbance. Dilley wrote that he ordered Mocek four times

to lower his voice or else Mocek would be ordered to leave the airport, and that
Mocek refused. Dilley wrote in the criminal complaint that Mocek "was refusing
and began causing a disturbance, by yelling," and that Mocek "had his voice raised
at a level that it was now creating a disturbance." *Id.*

.       Audio and video recordings of the incident contradict Dilley's claims.
Mocek consistently used a calm, quiet tone of voice, and it was the officers' voices
that were agitated and raised. Dilley never told Mocek to lower his voice.
Moreover, Dilley never issued a verbal Criminal Trespass Order, merely telling
Mocek, "You're leaving the airport. You're being escorted out at this point. Let's
go. And if you refuse, we'll arrest you." Dilley then changed his mind, saying,
"Actually, I'm gonna need your I.D. now," a request requiring Mocek to stay in
place. After a brief exchange over whether Mocek was required to provide I.D.,
Dilley said, "Let's go." Mocek immediately gathered his bags and began walking
with Dilley away from the checkpoint. At no point did Mocek refuse to comply
with any of Dilley's orders.  Dilley never stated the justification for arresting
Mocek. At various points during his encounter with Mocek, Dilley stated first that
he was "going to arrest" Mocek for using a camera, then that Dilley would arrest
Mocek if he refused to leave the airport, then that Dilley would arrest Mocek if he
refused to provide I.D. When Dilley finally and unequivocally placed Mocek under
arrest, he did not state the reason for the arrest.  App.22-23.

### De La Pena's supplemental incident report

After the arrest, De La Pena authored a false supplemental incident report containing similar untruths. The report describes TSA agents reporting to Dilley that Mocek was causing a disturbance by "yelling at officers"; that after Dilley asked Mocek to comply with TSA instructions, Mocek "state[d] 'I know my rights' with a loud voice causing attention from other passengers", that Mocek's "voice was so loud he was causing other passengers to hesitate before continuing through the checkpoint", that Mocek "yelled out loud 'I know my rights[,] I refuse to be searched", and that Dilley issued a "verbal order to leave" with Mocek refusing to comply.  App.23.

.    Mocek consistently used a calm, quiet tone of voice. Mocek did not yell at any TSA agents or law enforcement officers. Mocek did not yell "I know my rights." Moreover, video footage shows people walking by without any hesitation. Further, while Mocek did in fact refuse consent to being searched, Mocek did so by merely stating twice (and not yelling), "I don't consent to any search." And when Mocek was told to place his bags down, Mocek immediately complied with the request by placing his bags on the ground where indicated, a fact which is confirmed by video security footage.  App.23-24.

.    **Wiggins's supplemental incident report**

Sometime after the arrest, Wiggins authored a false supplemental incident report containing similar untruths. Wiggins wrote that Mocek "was talking in a loud tone of voice stating he did not do anything because it was his right to be able to take photos in a public accessible places [sic]." Wiggins wrote that Mocek's behavior "caused the traveling public to stop and take notice." and that Mocek "continue[d] to be recalcitrant." App.24.

Mocek consistently used a calm, quiet tone of voice. Moreover, the video footage reveals that the traveling public in general did not "stop and take notice." Passengers walked by without any hesitation. App.24.

Statements from TSA officers Breedon and Schreiner do not corroborate the claims in Dilley's, De La Pena's, and Wiggins's accounts. App.24. Breedon asked Schreiner, the supervisory TSO, to call the state police officers; Schreiner relayed the request. App.12, 24-25. After Mocek "challenged the notion that taking pictures was prohibited", Schreiner complained to state defendant police officer Dilley about Mocek's taping and picture taking. App.25-26. Schreiner's report after the arrest described Mocek as "hostile", "belligerent", and "taking photographs in a threatening manner". *Id.* TSA agents, which may have included one or more of the federal defendants, made the following statements to the city defendants about the plaintiff: "creating a disturbance", "he won't put his camera

16

down, either" and "taking pictures of all of us".   App.18-19. None of Mocek's actions violated any law, regulation or policy.  App.2-3.

The City of Albequerque police documents tell a story:   Mocek raises his voice and causes a disturbance, following which the law enforcement officers demand I.D. and issue a verbal no-trespass order.  Mocek refuses to comply. The TSA written statements, by contrast, give no suggestion that Mocek caused any public disturbance and don't mention any no-trespass order.  App.26.

The video and audio recordings make clear that Mocek did not raise his voice or refuse to obey an order to leave the airport.  The recordings confirm that Mocek calmly and nonbelligerently insisted that he had a right to continue filming. It was this insistence that annoyed the officers, who then declared that Mocek was "in trouble." Only after officers demanded that Mocek provide documentation of identity did any officer suggest that Mocek had disturbed the peace.  App.26.

### Mocek is arraigned on four charges

Mocek and others were taken to a waiting area outside a virtual courtroom in which the judge and clerk appeared via videoconference. He pleaded not guilty to the charges of disorderly conduct, concealing identification, refusing an officer's order, and criminal trespass.  App.26.

Mocek's bail was eventually posted around 5 p.m., although it took nearly

five hours to process Mocek's release. Mocek was dropped off in downtown

Albuquerque at about 10:00 p.m. *Id.*

### Mocek returns to the airport to fetch his belongings and notices that his camera has been tampered with while in police custody

The next day, Mocek went to the airport's police office to retrieve his things.

After being reunited with his possessions, Mocek stopped in the hall to turn on his

camera and found that all images had been deleted. Mocek returned to notify the

police that someone had tampered with his camera. An officer told Mocek that he

was not involved, and suggested that Mocek file a report. App.27.

### Mocek recovers deleted images and footage of the airport incident

The next day, November 18, 2009, on the plane returning home, Mocek used

forensic software that locates and recovers deleted files, and recovered his video

from his camera's memory card. App.27

### Mocek is tried and acquitted in New Mexico state court

Beginning on January 20, 2011, Mocek was tried in Bernalillo County

Metropolitan Court, Criminal Case No. 2573709, before Judge Kevin L. Fitzwater,

on the four charges against him. *Id.*

During the trial, Breedon and Dilley testified for the state. In addition, the

prosecution offered into evidence Mocek's videorecording of the incident at the

Albuquerque airport security checkpoint area and played the video for the jury.

Mocek did not offer any evidence of his own. During closing argument, defense

counsel for Mocek argued that the law enforcement and TSA witnesses were not

credible; that their testimony was contradicted by Mocek's video and by common

sense; that what law enforcement and the TSA really objected to was Mocek's

having legally taken pictures of and filmed them; and that any disorderly conduct

was on the part of TSA and law enforcement, not Mocek.  App.27.  On January 21,

2011, following two days of testimony, Mocek was acquitted of all four charges

against him after only an hour of deliberations.  App.27-28

.    **Consequences of the Defendants' actions**

Defendants' unlawful and unconstitutional conduct resulted in Mocek's

arrest, detention, seizure and attempted destruction of his property, institution of

baseless criminal proceedings against him, and financial and emotional distress.

App.28. While the evidence was in the custody of the City Defendants, a concerted

effort was made to scare him away from seeking a fair trial by deleting the video of

his encounter with the Federal and City Defendants. App.27.

.    Mocek spent more than $34,000 in legal costs to defend against the criminal

charges.  App.28

**Plaintiff's civil suit**

Plaintiff's First Amendment claims against the Federal and City Defendants

were for their "above-described unlawful policies, practices and conduct in

arresting Plaintiff, seizing his camera and memory contained therein, searching his camera and its memory contained therein, attempting to destroy evidence by deleting the contents of the camera, and causing the filing criminal charges against him, in retaliation for his video and audio recording of them, were intended to and did interfere with Plaintiff's constitutionally protected right to record audio and video where such recording was permitted, and chill Plaintiff from such activity in the future. These policies, practices, and conduct violate Plaintiff's free speech and associational rights..." App.28-29; 86-98; 309-312.

Plaintiff argued that Defendants' actions violated the Fourth Amendment. These actions were pretextual – a sham designed to injure the Plaintiff's rights and seize his camera. App.29-30, 100-105, 308-311. Defendants also conducted or caused the arrest to occur without probable cause. App.29-30, 100-105, 311-312.

City Defendants committed abuse of process by instituting criminal judicial proceedings against Plaintiff and misusing and actively participating in the misusing of the legal process by filing (or inducing the filing) of a criminal complaint against Plaintiff without probable cause, through the providing of information while knowing it to be false, in furtherance of the illegitimate end of retaliating against Plaintiff for his video and audio recording of them. App.31,310-311.

The Defendant City was municipally liable, as its policymakers had in force and effect a policy, practice, or custom to prohibit lawful photography and filming in publicly accessible areas of the Albuquerque airport, even though no statute or ordinance prohibits such photography and filming; to require individuals to provide documentation of identity even when providing such documentation is not required; to engage in retaliatory behavior by arresting or threatening to arrest individuals who seek to engage in such lawful actions; and to fail to properly discipline, train and supervise its officers. App.31-32, 314.

Plaintiff sought declaratory relief to ensure that he would not be subjected again to the above-described actions. App.32-33, 314.

During the litigation, Plaintiff asked the court to permit him to amend the complaint if necessary to allege additional facts, as well as to amend the complaint to include a copy of the transcript of the deleted video. App.106, 309, 314.

At hearing, the court noted that there is no federal regulation regarding Mocek's conduct in photographing.  App.424. Defense counsel argued that the TSA agents said that rather than answer their questions, Mocek began filming during the alternative screening process.  App.425. Plaintiffs' complaint alleged that during this time "Mocek said that he intended to comply with all of the TSA's rules and regulations."  App.19. Defense counsel argued that "Mocek is not allowed to film the monitors during the screening procedures."  App. 426.  Nothing

in the record indicates any attempt to film the monitors. Mocek knew that might

be illegal even though TSA consistently refused to provide any law on the subject.

App.15, 17.

In response to questioning, Plaintiff's counsel asserted that the TSA agents

were present during his entire interactions with the Albuquerque police. App.432.

All of Plaintiff's causes of actions were denied in the Defendants' motions

to dismiss. App.134, 386. Before the City Defendants filed any motions in this

case, the court held that Defendant Dilley had probable cause to arrest Plaintiff,

that Mocek's arrest was lawful, and that the search incident to his arrest was not

unlawful. The court also held that Plaintiff did not give his name to City

Defendants. App.236-238, 244-245, 440.

Mocek's requests for permission to amend his complaint were denied.

App.400-401.

## SUMMARY OF THE ARGUMENT

The Defendants failed to provide sufficient evidence to rebut Plaintiff's

contention that the Complaint adequately cited sufficient facts to survive a motion

to dismiss. The Court dismissed Plaintiff's theories for liability against the Federal

and City Defendants based on the First and Fourth Amendment, as well as

Plaintiff's request for declaratory relief. Plaintiff's causes of action against the

City Defendants for municipal liability and malicious abuse of process were also

dismissed. The court also refused to allow Plaintiff to amend the complaint to allege any additional facts or to include the transcript of the events at the airport. App.314, 316.

The law in these areas is clear and does not permit a grant of qualified immunity. The law is clearly established that Plaintiff was engaged in news and information gathering, a First Amendment-protected activity of all citizens. *Journal Pub. Co. v. Mechem*, 801 F.2d 1233, 1236 (10th Cir. 1986). The clearly established inquiry does not require a fact pattern "directly on point". *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011).

The Defendants' response to Plaintiff's exercise of this right was to halt this activity and arrest him without a reasonable basis to believe that probable cause existed. City Defendant Dilley arrested Plaintiff for not providing "credible and reliable information" in the course of an unjustified *Terry* stop that went beyond the bounds of the original reason for the stop. It is clearly established law that the Supreme Court has barred demands for I.D. even when reasonable facts exist. *Kolender v. Lawson,* 461 US 352, 360 (1983). Because the Court's ruling was dispositive of the outcome, it constitutes reversible error.

As unconstitutional policies, practices and conduct are properly alleged,
Plaintiff's municipal liability claim should go forward.  If any of these acts are
protected by qualified immunity, a cause of action against that municipal defendant
would still be valid. *Medina vs. City and County of Denver*, 960 F.3d 1493 (10th
Cir. 1992). Plaintiff's declaratory relief claim should go forward.  Where a
plaintiff's right to free speech has been infringed in the past, the chilling effect on
free speech is deemed to be a sufficient continuing injury to merit standing to
enjoin the unconstitutional statute or policy.  See *Secretary of State of Maryland v.
Joseph H. Munson Co.,* 467 U.S. 947, 956-957 (1984).                    As
Defendants never briefed the malicious abuse of process claim, it should be
remanded to the Court.    Plaintiff set forth an adequate claim.  See, e.g., *Santillo v.
N.M. Dep't of Public Safety*, 143 N.M. 84 (Ct.App. 2007); *Fleetwood Retail Corp.
of N.M. v. LeDoux*, 142 N.M. 150, 159 (2007). Plaintiff should be permitted to
amend the complaint.  Challenges to a motion to dismiss are reviewed *de novo*.
*Soc'y of Separationists v. Pleasant Grove City*, 416 F.3d 1239, 1240–41 (10th Cir.
2005).

## ARGUMENT

## INTRODUCTION

The Court held that Mocek had not sufficiently alleged that the officers violated his First Amendment rights because the Albuquerque Sunport is a non-public forum, subject only to reasonable government restrictions on First Amendment Activity, and here, the Defendants actions were reasonable. App. 134-35, 222-231; 3 App. 386.) In addition, the District Court found that Defendants' actions were viewpoint neutral. App. 388. Thus, "Mocek's conduct was not constitutionally protected." App.386; see also App.23. The Court further held that Defendants were entitled to qualified immunity because Mocek's right to gather news and information at the airport screening checkpoint and to record police activity in public was not clearly established. App. 135, 222; App. 3. The Court is wrong all these points.

## I.     MOCEK PLED SUFFICIENT FACTS TO STATE A CLAIM OF FIRST AMENDMENT RETALIATION

### A. STANDARD OF REVIEW

In a First Amendment case, there is "an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 499, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984)* (internal citations omitted).  The district court's findings of fact and its conclusions of law are reviewed *de novo. Revo v. Disciplinary Bd. of the*

*Supreme Court*, 106 F.3d 929, 932 (10th Cir. 1997).  Review is conducted "without

deference to the trial court." *Hurley v. Irish-American Gay, Lesbian & Bisexual*

*Group of Boston, 515 U.S. 557, 567, 115 S. Ct. 2338, 132 L. Ed. 2d 487 (1995)*;

see also *New York Times Co. v. Sullivan*, 376 U.S. 254, 285, 84 S. Ct. 710, 11 L.

Ed. 2d 686 (1964).

To state a claim for retaliation under the First Amendment and survive a motion

to dismiss, Mocek was only required to "state a claim to relief that is plausible on

its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations and

quotations omitted). Mocek exceeded that standard as to each of the required

elements:

> (1) the plaintiff was engaged in constitutionally protected activity;
>
> (2) the defendant's actions caused the plaintiff to suffer an injury that
> would chill a person of ordinary firmness from continuing to engage
> in that activity; and
>
> (3) the defendant's adverse action was substantially motivated as a
> response to the plaintiff's exercise of constitutionally protected
> conduct.

*Klen v. City of Loveland, Colo.,* 661 F.3d 498, 508 (10th Cir. 2011) (citing

*Worrell v. Henry,* 219 F.3d 1197, 1212 (10th Cir.2000)). Importantly, "[a]n act

taken in retaliation for the exercise of a constitutionally protected right is

26

actionable under § 1983 even if the act, when taken for a different reason, would have been proper." *DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir. 1990). "The unlawful intent inherent in such a retaliatory action places it beyond the scope of a police officer's qualified immunity if the right retaliated against was clearly established." *Id.*

### B. Mocek was Engaged in Constitutionally Protected Activity

News and information gathering "is an activity protected by the First Amendment." *Journal Pub. Co. v. Mechem*, 801 F.2d 1233, 1236 (10th Cir. 1986) (citing *Branzburg v. Hayes,* 408 U.S. 665, 681 (1972)); *see also Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576 (plurality opinion) (recognizing that the First amendment incorporates a right "to gather information."). Gathering information is among the freedoms that are "necessary to the enjoyment of other First Amendment rights." *Globe Newspaper Co. v. Super. Ct.,* 457 U.S. 596, 604 (1982); *see also United States v. Sherman*, 581 F.2d 1358, 1361 (9th Cir. 1978) ("The Supreme Court has recognized that newsgathering is an activity protected by the First Amendment.").

The government may not "limit[] the stock of information from which members of the public may draw." *First Nat'l Bank v. Bellotti,* 435 U.S. 765, 783 (1978). Therefore, "[t]here is an undoubted right to gather news 'from any source by means within the law.'" *Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978). This

right is not limited to members of the press; it applies equally to all citizens. *See*

*e.g., Branzburg,* 408 U.S. at 684.

The protections of the First Amendment extend not only to traditional forms

of "speech," but also conduct that is necessary for, or integrally tied to, acts of

expression and communication. That is why audiovisual recording, media of

expression commonly used for the preservation and dissemination of information

and ideas, are "included within the free speech and free press guaranty of the First

and Fourteenth Amendments." *Am. Civil Liberties Union of Illinois v. Alvarez*, 679

F.3d 583, 595 (7th Cir. 2012), cert. denied, 133 S. Ct. 651 (U.S. 2012) (quoting

*Burstyn v. Wilson,* 343 U.S. 495, 502 (1952)). Moreover, the act of *making* an

audiovisual recording is necessarily included within the guarantees of the First

Amendment as a corollary of the right to disseminate the resulting recording. "The

right to publish or broadcast an audio or audiovisual recording would be insecure,

or largely ineffective, if the antecedent act of *making* the recording is wholly

unprotected …"*Id.* 679 at 595. "This is a straightforward application of the

principle that '[l]aws enacted to control or suppress speech may operate at different

points in the speech process.'" *Id.* (quoting *Citizens United v. FEC,* 558 U.S. 310

(2010)).

This right naturally extends to the right to photograph and film public

officers performing their public duties in public places. *See Smith v. City of*

*Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (recognizing First Amendment

right to videotape police activities); *Fordyce v. City of Seattle,* 55 F.3d 436, 439

(9th Cir.1995) (same); *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011)

(recognizing First Amendment right to "videotape police carrying out their

duties"). Indeed, "[g]athering information about government officials in a form

that can readily be disseminated to others serves a cardinal First Amendment

interest in protecting and promoting 'the free discussion of governmental affairs.'"

*Glik,* 655 F.3d at 82 (citing *Mills v. Alabama,* 384 U.S. 214, 218 (1966)). The right

to gather information helps to secure "'the paramount public interest in a free flow

of information to the people concerning public officials…" *Pell v. Procunier*, 417

U.S. 817, 832 (1974) (internal citations and quotations omitted).

## C. Defendants' Actions Caused Mocek to Suffer an Injury That Would Chill a Person of Ordinary Firmness

The second element of Mocek's retaliation claim was also met. The State

and Federal Defendants actions are, objectively, the stuff that would chill a person

of ordinary firmness. *See Smith v. Plati*, 258 F.3d 1167, 1177 (10th Cir. 2001).

As to the Federal Defendants, their orders to halt the newsgathering, to turn

off the recorder, and their attempts to seize the recorder away from Mocek are all

sufficiently chilling.[1] App.18 at ¶¶ 46-48; 24-25 at ¶¶ 75-77. Of course, they also

called the City Defendants to intercede and take further action. *Id.* 24-25 at ¶¶ 75-

77. The fact that the federal defendants did not make the arrest, search him, or file

criminal charges against him, does not negate their liability on this second prong.

     *Tobey v. Jones*, 706 F.3d 379 (4th Cir. 2013) is directly on point. In *Tobey*,

an airline passenger alleged, *inter alia*, that TSA officials and airport police

officers retaliated against him in violation of his First Amendment rights when he

was seized and arrested for displaying the text of the Fourth Amendment to the

United States on his chest. *Id.* at 383. In correcting the District Court's "erroneous

conclusion" that the plaintiff had failed to plead that TSA agents, "neither of whom

are law enforcement officers with the power of arrest," were responsible for his

arrest by the state police defendants, the appellate court explained that there were

no "precise magical words." *Id.* at 385 (citing *Bell Atlantic v. Twombly*, 550 U.S.

---

[1]    It is important to remember that the test here is objective and the fact that a Plaintiff is not
actually deterred is not determinative. *See Shero v. City of Grove, Okl.*, 510 F.3d 1196, 1203
(10th Cir. 2007) (internal citation omitted). Mocek need not show that his "speech was actually
inhibited or suppressed" but "whether an official's acts would chill or silence a person of
ordinary firmness from future First Amendment activities." *Lacey v. Maricopa Cnty.*, 693 F.3d
896, 916 (9th Cir. 2012) (internal citation omitted); "[A]ny form of official retaliation for
exercising one's freedom of speech, including prosecution, threatened prosecution, bad faith
investigation, and legal harassment, constitutes an infringement of that freedom." *How v. City of
Baxter Springs*, 217 F. App'x at 797 (quoting *Worrell*, 219 F.3d at 1212).

544, 555 (2007)). Section 1983 (and by association *Bivens*) anticipates that a government official will be "responsible for the natural consequences of his actions." *Id.* at 386 (citing *Malley v. Briggs,* 475 U.S. 335, 344 n. 7 (1986) (quoting *Monroe v. Pape,* 365 U.S. 167, 187 (1961)); *see also Berg v. County of Allegheny,* 219 F.3d 261, 272 (3d Cir.2000) ("A government official's liability for causing an arrest is the same as for carrying it out.") (internal quotation marks omitted)). The Court stated that it "is an undoubtedly natural consequence of reporting a person to the police that the person will be arrested; especially in the scenario we have here, where TSA and [airport] police act in close concert." *Id.* "So long as Mr. Tobey's complaint rendered it plausible that Appellants helped effectuate his arrest, the district court should have factored the arrest into its decision as to whether Mr. Tobey alleged plausible *Bivens* claims against Appellants." *Id.* Moreover, "[t]his inference is bolstered by the fact that Appellants silently stood by and watched [airport] police arrest Mr. Tobey." *Id.*

As to the City Defendants, after the Federal Defendants told the City Defendants that Mocek was "causing a disturbance" and would not put down his camera, and the City Defendants tried also to improperly command Mocek to stop filming, he was seized, searched, arrested, his property was tampered with and almost destroyed, and he was criminally prosecuted. All of these actions taken by the City Defendants would chill a person of ordinary firmness from continuing to

engage in that activity. App.18-22 at ¶¶ 49-67; 26-27 at ¶¶ 80-82, 86; 28 at ¶ 89.;
*see City of Baxter Springs,* 217 F. App'x at 797.

### D. Defendants' Adverse Actions Were Motivated by Mocek Filming

Finally, Mocek has also pled facts sufficient to show that Defendants'
adverse actions were substantially motivated as a response to the exercise of
constitutionally protected conduct.

Plaintiff's complaint contains all necessary allegations that defendants'
adverse action was substantially motivated as a response to his exercise of
constitutionally protected conduct – the filming.  When Mocek told the TSA agents
that he had no ID for them, their response was that they would contact the
Operations Center, and if Mocek could not be identified, Mocek would not be
allowed to proceed through the security checkpoint.

At this point in time, there was no indication from any of the TSA agents
present that there was any intent to involve law enforcement. App.17 at ¶ 45. It
was only when Mocek began filming the Defendants' activities that the activities
described above took place. *Id.*18-19 at ¶ 46-50; 24-25 at ¶ 75-76. Breedon asked
Schreiner to call the city police officers. *Id.*24-25 at ¶¶ 75-76. Schreiner falsely
claimed that Mocek was "hostile", "belligerent", and "taking photographs in a

threatening manner". *Id.*25-26 at ¶¶ 77-78. Schreiner said that Mocek "challenged

the notion that taking pictures was prohibited." *Id.*25 at ¶ 77.

City Defendant Dilley finally told Mocek to "comply with the TSA agents'

instructions or else he would be escorted out of the airport." *Id.*19 at ¶ 51. When

Mocek refused to halt his filming, the City Defendants threatened to arrest him.

*Id.*19 ¶ 52.  Mocek never refused to leave the airport.  *Id.*19 at ¶ 53.  Instead, he

was arrested. *Id.*19-20 at ¶¶ 54-55.  When Mocek said he was going to remain

silent and wanted to talk to an attorney, Mocek was arrested and his camera was

seized (and its contents deleted). *Id.*19 at ¶¶ 54, 57-73. Mocek was taken to jail,

searched, booked, and eventually tried. *Id.*18-22 at ¶¶ 49-67, 80-82, 86, 89.  Of

course, a jury found him not guilty of every alleged offense. *Id.*28 at ¶ 88. The

temporal proximity of the events also provides strong circumstantial evidence of

retaliation. *Pollack v. Reg'l Sch. Unit 75*, 2:13-CV-00109-NT, 2014 WL 1321118.

(D. Me. Mar. 31, 2014) (citing *Hannon v. Beard,* 645 F.3d 45, 49 (1st Cir.2011)

(quoting *Gayle v. Gonyea,* 313 F.3d 677, 683 (2nd Cir.2002)).

## II. DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY ON MOCEK'S FIRST AMENDMENT CLAIM

Taken in the light most favorable to Mocek, the facts alleged show that

Plaintiff's First Amendment right was violated and that right was clearly

established at the time of the violation.

## A. Defendants Violated a Clear Constitutional Right

As already discussed above, Mocek had a First Amendment right to gather news and information and that right was violated. The District Court's conclusion that Mocek did not suffer a constitutional violation because Defendants' actions were reasonable and in a non-public forum was deeply flawed. (1 App. 229-231; 3 App. 491-93.) Indeed, the Court fundamentally misperceived the essence of Mocek's claim.

## B. The Defendants' Retaliatory Actions were Unreasonable

The Defendants and District Court relied too much on *Int'l Soc. For Krishna Consciousness, Inc., v. Lee*, 505 U.S. 672 (1992) ("*Krishna*").[2] That airports are not typically considered public fora does not mean that the government can restrict speech in whatever way it likes with *ad hoc* justificatiTons. "The Government, even when acting in its proprietary capacity, does not enjoy absolute freedom from First Amendment constraints..." *United States v. Kokinda*, 497 U.S. 720, 725 (1990); see also *Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus,*

---

[2]     Whether forum analysis even applies in cases dealing with newsgathering is still unclear. See, e.g. *S.H.A.R.K. v. Metro Parks Serving Summit County*, 499 F.3d 553, 559-60 (6th Cir. 2007) (declining to evaluate challenge to recording events at public park under public forum analysis because case "is about access to information as opposed to the right to expression." *Whiteland Woods, L.P. v. Township of West Whiteland*, 193 F.3d 177, 181-83 (recognizing presumptive constitutional right of access to governmental meetings but declining to adopt public forum analysis). In cases dealing with the right to gather news or information, access to a particular forum is not the issue, instead, like here, the right to observe and report is.

*Inc.*, 482 U.S. 569, 576 (1987) (recognizing non-disruptive speech unrelated to traditional airport related activities is still protected speech in a nonpublic forum.); *Lee v. Int'l Soc. For Krishna Consciousness, Inc.*, 112 S.Ct. 2709, 2710 (1992) (ban on distributing literature in airport terminals invalid under First Amendment). Even in an airport, the government may not retaliate against an individual for the valid exercise of their First Amendment rights. *Tobey*, 706 F.3d at 391.

Moreover, Mocek's passive filming is qualitatively different than the soliciting described in *Krishna. See Krishna*, 505 U.S. 672. Information gathering is not expressive in the same way that burning a flag or wearing a black armband is. That it is generally passive, and is often utilized to facilitate *later* acts of expression, including at times a more explicit viewpoint,[3] does not destroy the constitutional protections that adhere to it. *See Citizens United*, 558 U.S. at 336–37. Activities that are not intuitively expressive may implicate the First

---

[3]      Mocek's viewpoint, or expressive purpose, was the documenting of what he perceived to be an atypical, alternative identification policy, then later, the retaliatory treatment he was experiencing. (1 App. 9 at ¶¶ 1, 3; 18-20 at ¶¶ 46-55.) That Mocek did not vocalize his intent does not matter; a photographer documenting police misconduct does not need to explain to the police why he is filming. *See e.g., Smith*, 212 F23d at 1332 (finding constitutional right to film police activity without inquiring into reasons for filming); Robinson, 378 F. Supp. 2d at 541 ("Although [plaintiff] need not assert any particular reason for videotaping the troopers, he was doing so in order to make a visual record of what he believed was the unsafe manner in which they were performing their duties.")

Amendment because they facilitate speech. *See Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575 (1983) (state tax on ink and paper violated First Amendment); *Citizens United*, 558 U.S. at 310 (federal law prohibiting corporations from spending general treasury funds on campaign ads violated First Amendment).

An exercise of an individual's first amendment right to film public officials carrying out public duties necessarily remains unfettered unless and until a reasonable restriction is placed on it. Here, there was no such reasonable restriction. Although the District Court made much of potential security and safety concerns that *could* justify the Defendants actions in the abstract, there is, in fact, no evidence or allegations to support those findings. (See 1 App. 227-230; 3 App. 489-91.)

There is *no* evidence and there are *no* allegations that Mocek was in a position to have filmed the security monitors or anything on them; that Mocek's actions "diverted" officers from doing other duties or caused delays; or that Mocek did, or could have, allowed a passenger with an "illicit" purpose to pass though the checkpoint. (1 App. 228; 490.) There is *no* evidence and there are no allegations that even if Mocek had relayed his purpose to TSA officials they would have been

any less "distracted."[4] (Id.) There is *no* evidence and there are *no* allegations that Mocek was causing a disturbance.[5] Mocek was calm and compliant and a jury found him not guilty of all crimes alleged. (1 App. 9 at ¶ 5; 10 at ¶9; 17-20 at ¶¶ 44-56; 28 at ¶ 88.) Anything else is improper speculation.[6]

To ignore the pleadings and conclude that Defendants' actions were reasonable *in the abstract* is also to ignore the gravamen of Mocek's First Cause of Action. It bears repeating that, an act taken in retaliation for the exercise of a constitutionally protected right is actionable even if the act, when taken for a different reason, is otherwise proper or reasonable. *DeLoach,* 922 F.2d at 620. Indeed, if the speculative reasonableness of defendants' actions were all that were required, it would be impossible to ever state a claim of retaliation in a non-public or limited

---

[4]    The District Court also found that, because Mocek did not "assure" the defendants that he was not filming the monitors, Defendants actions were reasonable. (App. 229; 491.) Again, there is simply no evidence or allegations in the record to support that assertion.

[5]    The Court cursorily cited to *Hill v. Nat'l Transp. Dafety Bd.,* 886 F.2d 1275, 1282 (10Th Cir. 1989) for the proposition that "'engaging in newsgathering activities' does not exempt a person from Federal Aviation Administration safety regulations. (1 App. 223; 3 App. 485.) However, there were no such regulations here and no evidence in the record of "unsafe" behavior.

[6]    Furthermore, at this juncture, whether or not Mocek's actions were so "disruptive" as to make the Defendants' actions reasonable is a question of fact better suited for summary judgment. *See e.g., Tobey* 706 F.3d at 393.

public forum. The issue here is whether the *discretionary* actions taken by Defendants were retaliatory *in this case*.[7]

At all times, Mocek was in the publicly accessible areas of the airport. App. 9 at ¶ 5; 20 at ¶ 56. Defendants, at all times, were plainly visible in a publicly accessible area. The fact that Defendants did not like his activity – that they found it strange or even annoying – is not enough. *See Tobey*, 706 F.3d at 388. Law enforcement and public officers cannot justify the refusal to allow someone to film what is in plain sight on the basis of a time, place, manner restriction if the purpose of the restriction is to censor what is being seen and recorded. That would be a content based restriction and a prior restraint on Free Speech. *Rosenberger v. Rector and Visitors of Univ. of Virginia,* 515 U.S. 819, 828 (1995) ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."); *Robinson*, 378 F. Supp. 2d at 541 ("[T]o the extent that the troopers were restraining Robinson from making any future videotapes and from publicizing or publishing what he had filmed, the defendants' conduct clearly amounted to an unlawful prior restraint upon his protected speech.

## C.  The Right to Gather News Was Clearly Established

---

[7]   Of course, video recording and picture taking was not wholly prohibited in the airport, and many people engage in this activity without incident. Defendants' singling out of Mocek was retaliatory.

The right to engage in information is a right that was already clearly established at the time Mocek's First Amendment rights were violated. *See First Nat. Bank of Boston* 435 U.S. at 783; *Branzburg,* 408 U.S. at 681. Even the Tenth Circuit has recognized that "[n]ews gathering is an activity protected by the First Amendment." *Mechem*, 801 F.2d at 1236. While *Mechem* discussed this right as it related to jurors interviews, and not the filming of public officials, it is well settled that the "clearly established" inquiry does not require "a case directly on point." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011). "[O]therwise we would be required to find qualified immunity wherever we have a new fact pattern." *York v. City of Las Cruces*, 523 F.3d 1205, 1212 (10th Cir. 2008) (internal quotation marks omitted). Rather, "a general constitutional rule can apply with obvious clarity to the specific conduct in question, even though such conduct has not previously been held unlawful." *Id.* (internal quotation marks and alterations omitted).

This general constitutional rule – that the First Amendment protects newsgathering has been recognized in several other circuits as well. Indeed, various circuit (and District courts) have held that recording police officers and public officials in the course of carrying out their duties is directly protected by the First Amendment, which is exactly what Mocek was doing here. In *Glik v.*

*Cunniffe*, 655 F.3d 78 (1st Cir. 2011),[8] the Court asked: "[I]s there is a

constitutionally protected right to videotape police carrying out their duties in

public?" *Id.* at 82. The court held that "[b]asic First Amendment principles, along

with case law from this and other circuits, answer that question unambiguously in

the affirmative." *Id.* The court went on to conclude that the right to record the

police was clearly established, resting its conclusion primarily on the Supreme

Court's observations about the right to gather and disseminate information about

government: "Gathering information about government officials in a form that can

readily be disseminated to others serves a cardinal First Amendment interest in

protecting and promoting 'the free discussion of governmental affairs.'" *Id.*

(quoting *Mills,* 384 U.S. at 218.

The weight of circuit authority, decided prior to the November 2009 incident

here, is in accord. See *Gilles v. Davis*, 427 F.3d 197, 212 (3d Cir. 2005)

("[V]ideotaping or photographing the police in the performance of their duties on

public property may be a [First Amendment] protected activity."); *Smith*, 212 F.2d

at 1333 ("The First Amendment protects the right to gather information about what

---

[8] *Glik v. Cunniffee*, was decided in 2011, but it relied in turn on an earlier First Circuit case, *Iacobucci v. Boulter*, 193 F.3d 14 (1st Cir. 1999), which predates Mocek's arrest. *Iacobucci* denied qualified immunity to police officers who arrested a journalist for filming officials in a hallway outside a public meeting. *Iacobucci*, 193 F.3d at 18. In discussing the clearly established right to film, the *Glik* court noted the "brevity of the First Amendment discussion, a characteristic found in other circuit opinions that have recognized the a right to film government officials or matters or publci interest in public space. *Glik*, 655 F.3d at 85. The court went on to conclude that this "terseness implicitly speaks to the fundamental and virtually self-evident nature of the First Amendment's protections in this area. *Id.*

public officials do on public property, and specifically, a right to record matters of public interest."); *Fordyce,* 55 F.3d at 438-39 (in case where plaintiff claimed police violated his First Amendment rights by interfering with his attempts to videotape a protest march, recognizing the right to gather news includes a "First Amendment right to film matters of public interest"); *Blackstone v. Alabama*, 30 F.3d 117, 120 (11th Cir. 1994) (noting prohibition on recording a public meeting "touched on expressive conduct protected by Free Speech Clause"); *see also Robinson v. Fetterman*, 378 F.Supp.2d 534 (E.D. P.A. 2005) (holding that the First Amendment protected videotaping of state troopers).

If any more authority on this issue was necessary on the day of the event, it can be found in the very agency in question. When asked in 2009, agency personnel stated unequivocally that recording was permitted in public areas. App.16 ¶37.

The court here should recognize the well-established authority protecting the right of anyone to gather non-disruptive information by video or audio recording of public officials in the performance of their duties.

## III.    DEFENDANTS VIOLATED PLAINTIFF'S FOURTH AMENDMENT RIGHTS

### A.  Standard of Review

41

The ultimate determination of the reasonableness of a search or seizure is reviewed *de novo. United States v.*

*Karam,*4963d 1157, 1161 (10th Cir. 2007).

### B. The City Defendants conducted a pretextual arrest and search

#### 1. This conduct was clearly pretextual

The City Defendants' arrest and search was a sham. Their conduct was designed to injure Plaintiff's rights, seize the camera, and make the film unusable at trial or anywhere else. Although "reasonable suspicion" is conducted with an objective analysis, a pretextual search - where officers attempt to justify on a ground which does not correspond to their real purpose - may cause a constitutional violation. In its 134-page opinion, the court refused to address this central contention of pretextual arrest and search in its analysis. App.496-508.

It is self-evident that this was a pretext:

(a) Mocek was not disturbing the TSA officers;

(b) Nonetheless, he agreed to be escorted away;

(c) The TSA defendants did not ask the City defendants that Mocek be arrested;

(d) The City Defendants arrested Mocek even though he had identified himself, and then lied and claimed that he did not identify himself;

(e) The numerous misstatements made in the City Defendants reports;

(f)  The City Defendants seized the camera because it obtained "evidence", but they then tried their best to destroy that evidence.   App.308-309.

It should be added that:

(g)  Mocek's name was on his boarding pass and provided to the TSA officers. App.017.

(h)  The light went on in Dilley's head to effect the arrest in order to create a pretext to seize the camera because it contained "evidence". Dilley then arrested Mocek for not producing ID, even though he had no ID in his possession. App.391-393.

As for the four criminal counts?  App.26. There was no basis to arrest him for "concealing ID" or "refusing an officer's order" – the ID was not in his possession.   As for "disorderly conduct", the court accepted "as true that, at all times in the incident, Mocek 'remained calm and restrained'".  App.236. Finally, there was no factual basis for any reason to believe Plaintiff committed criminal trespass.

### 2.  Plaintiff did not refuse to provide ID - he had no ID in his possession

The court found there was probable cause to arrest because Mocek did not provide ID.  App.388. The court ignored two companion findings that it had also made.  One was that Mocek had no ID in his possession App.391.  The other was that Mocek told Dilley that he did not have any ID to show him.  App.393. The

court also found that "the AAPD officers had reasonable suspicion that Mocek was engaging in criminal conduct, and thus Dilley's demand that Mocek produce identification was a lawful order." App.236-237. This finding was that "Mocek's right to film at the checkpoint is subject to reasonable time, place and manner restrictions. See Complaint paragraph 52". App.241.

Not only does Paragraph 52 say nothing of the kind, but no such restrictions were in place. With no such restrictions, there can be no reasonable suspicion of criminal conduct. TSA told Plaintiff that "there aren't any state or city laws/ordinances that prohibit photography in the public areas of the airport". When Plaintiff wrote to TSA that "I'm not aware of any related policies other than the one that says any photography or video recording must not interfere with TSA operations", TSA admitted that a request for advance coordination was "a local practice and not available in writing…The information I have provided to you is a recommendation. We only encourage individuals to contact TSA in advance so we can facilitate the photography". App.16, 390-391.

### 3. Plaintiff provided his identity to TSA, right on his boarding pass

The court's ruling that Plaintiff concealed his identity by failing to provide identification is inaccurate. App.505. The record shows Plaintiff providing his boarding pass with his name on it to TSA. App.391.

**4. The arrest and search of Plaintiff cannot be justified on a pretextual basis**

The test can be described as the "fabrication pretext" – this is not when the officer makes an arrest on a minor offense in order to justify the search, but rather when the arrest itself is fabricated. The "fabrication pretext" has its roots in *United States v. Abel,* 362 US 217, 226-230 (1960) where Justice Felix Frankfurter held that the arrest and search of the famous spy Rudolf Abel was constitutional, but repeatedly based his opinion on the good faith of the arresting agents.

The fabrication pretext is seen in *United States v. Pearl,* 944 F. Supp. 51, 52-54. (D. Me. 1996), where an officer arrested the defendants on federal drug charges after detaining them in a rest area on the highway.  The justification was that the officer had observed one of the men dumping a car ashtray on the ground in violation of Maine's littering statute.  The court ordered the evidence suppressed because of a finding that the officer had not observed the littering, but had fabricated his story after later seeing the ashes on the ground in order to provide justification for the stop.

Similarly, in *Winters v. Board of County Commissioners*, 4 F.3d 848 (10th Cir. 1993), the court held that a seizure of ring from pawnshop could not be justified on ground that officers were lawfully present to conduct administrative search, when they had gone to the shop to look for the ring.   In this case, the City

45

Defendants were bound and determined to arrest Mocek on any basis whatsoever once they learned that the federal defendants considered him "disruptive".

As in *Winters* and *Pearl*, the reports of Dilley and his colleagues were a creative, after-the-fact justification of a false arrest based on events that simply did not happen. To make matters worse, the City Defendants deleted the very videotape that Mocek had created when they realized the weakness of their case. This attempt to suppress exculpatory evidence violated the 4th Amendment. *Geter v. Fortenberry*, 849 F.2d 1550 (5th Cir. 1988). Happily, Mocek knew how to restore the tape. After the jury saw the tape, he was acquitted in an hour.

### 5. These facts also support Plaintiff's claim for abuse of process

Plaintiff's abuse of process claim for providing false information to assist in the filing of the criminal complaint went unaddressed by City Defendants in their Motion to Dismiss, except for a cursory comment that unless there is no probable cause pursuant to the 4th Amendment, this claim cannot survive. App.310-311. For that fundamental procedural reason alone, this cause of action should remain. Plaintiff claims no probable cause exists. As stated above, Plaintiff also claims that the arrest itself was based on a fabricated pretext. The court admitted that Plaintiff might be able to successfully amend this claim, but refused to let it happen. App.509-510. Plaintiff set forth an adequate claim. Plaintiff set forth an adequate claim. See, e.g., *Santillo v. N.M. Dep't of Public*

*Safety*, 143 N.M. 84 (Ct.App. 2007); Fleetwood *Retail Corp. of N.M. v. LeDoux*,

142 N.M. 150, 159 (2007).

### C. Even if there were no pretext, City defendants would still be liable for the 4th Amendment violations

#### 1.  Mocek's conduct was non-disruptive and is protected in the airport screening context

Even if there was no pretext, defendants would <u>still</u> be liable for the

constitutional violations. In *Tobey v. Jones*, 706 F.3d 379 (4th Cir. 2013) the

plaintiff claimed that enhanced screening procedures at airport violated Fourth

Amendment's prohibition against unreasonable searches and seizures and that his

arrest for protesting procedures violated his constitutional rights.  Plaintiff removed

his shirt at the TSA checkpoint and displayed the text of the Fourth Amendment

written on his chest.  As stated in the above First Amendment discussion,

Plaintiff's wrongful arrest was caused by the concerted actions of the Federal and

City Defendants.  *Tobey,* 706 F.3d at 386.

As to the non-disruptive nature of the conduct of the Plaintiff, *Sevigny v.

Dicksey*, 846 F.2d 953, 957 (4th Cir. 1988) held that some investigation may be

required before an arrest is made, depending on the circumstances.  New Mexico

law regarding the duty of police officers to conduct an investigation harmonizes

with this constitutional dictate, as admitted by City Defendants.  App.279-280. The

*Sevigny* court reasoned that because an objective test is to be used to determine

whether there is probable cause for an arrest, the calculation should be made not on

the basis of the subjective perceptions of the officer but on the situation "as a

police officer acting reasonably under the circumstances should have perceived it".

Thus, it would be permissible to consider what further investigation the officer

should have conducted at the scene.

The complaint alleges that Mocek at no time acted disruptively. "Mocek

said that he intended to comply with all of the TSA's rules and regulations."

App.19.  "Mocek in fact consistently used a calm, quiet tone of voice. Mocek did

not yell at any TSA agents or law enforcement officers. Mocek did not yell 'I

know my rights.'" App.23.  Mocek's conduct even in declining to follow the

defendants' unlawful orders was "calm" and "restrained" even in the face of TSA

agents' and law enforcement officers' increasingly agitated behavior. App.9; *see

also* App.22-23.

Harassment of individuals based on their life style – here, Mocek's penchant

for documentation and privacy - violates rights protected under the 4th, 1st, and 14th

Amendments. *Marland v. Heyse*, 315 F.2d 312 (10th Cir. 1963).  Nor was there

any evidence that Mocek's behavior disturbed other passengers. "[V]ideo footage

shows people walking by without any hesitation" and "the traveling public in

general did not 'stop and take notice.'" App.23-24. Neither the city defendants or

the TSA's own written statements, moreover (which the federal defendants have attached as exhibits to their motion), make no suggestion that Mocek caused any public disturbance. App.26. At all times, Mocek never went through the security checkpoint and remained in publicly accessible areas of the airport. App.9, 20.

### 2. Mocek followed the law, while Dilley lied in his report

Finally, it must be said that Mocek did identify himself to the TSA by providing them with a boarding pass with his name on it. Pursuant to *Hiibel v. New Mexico*, 542 US 177, 187-188 (2004), a *Terry* stop such as the one conducted by Dilley must be reasonably related to the initial reason for the stop. Mocek had not tried to enter the checkpoint, and he informed the TSA that he would comply with all of their rules and regulations. App.19. At that point, there was no reason for Dilley to ask Mocek for his name. Nor did Dilley ask for Mocek's name before his arrest. Instead, he asked for Mocek's I.D.

Statutes that demand that a suspect provide "credible and reliable ID" to a law enforcement officer have been stricken by the U.S. Supreme Court. *Id.* at 184-185. The court cited the New Mexico statute in his order. App.238.

As stated in *Kolender v. Lawson*, 461 US 352, 360 (1983), the Court held that such a statute was void because it provided no standard for determining what a

suspect must do to comply with it, resulting in virtually unrestrained power to
arrest and charge persons with a violation. Dilley repeatedly lied in his reports,
saying that Mocek had ignored four orders to lower his voice, disobeyed a criminal
trespass order, and "refused to identify himself". App.22.

Mocek gave the Federal Defendants the boarding pass that had his name on
it. Plaintiff told Dilley he had no ID in his possession. Dilley never asked Mocek
for his name before his arrest, which would have triggered a duty to provide one's
name pursuant to *Hiibel* if it was "justified in its inception…and reasonably related
in scope to the circumstances which justified the interference in the first place."
*Hiibel*, *id.*, at 185. Not only did Dilley had ready access to the boarding pass
Plaintiff provided to the Federal Defendants, but he was not interested in Plaintiff's
name in any case. Dilley wanted to find an excuse to arrest Mocek.

### 3. Dilley and the other defendants worked together in dreaming up the four criminal counts

Nonetheless, "concealing identity" and "resisting, obstructing, or refusing to
obey a lawful order of an officer" were two of the four counts for the arrest of the
Plaintiff. Dilley relied on his fellow officers and the Federal Defendants when he
cooked up his story. The same is true for the charge of "disorderly conduct". The
nonsense about a "verbal criminal trespass order" can be credited entirely to

Dilley.  At trial, Plaintiff won a swift and full acquittal.

## IV.  DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY FOR THE  FOURTH AMENDMENT VIOLATIONS

The qualified immunity inquiry in unlawful arrest cases is an objective one, focusing on whether "a reasonable officer could have believed that probable cause existed to arrest the plaintiff".  *Hunter v. Bryant*, 112 S.Ct. 534, 537 (per curiam). The defendant's knowledge is relevant, since the objective analysis is focused on a reasonable officer confronted with the clearly established law and information "readily available" to the officer.  *Romero v. Fay*, 42 F.2d 1472, 1476-1477 (10th Cir. 1995) states that the probable cause standard of the Fourth Amendment requires officers to "reasonably interview witnesses *readily available at the scene*, investigate basic evidence, or  otherwise inquire if a crime has been committed all before invoking the power of warrantless arrest and detention."

In this case, Mocek never refused to leave the checkpoint area.  Again, he informed TSA that he would abide by all of their laws and regulations.  There is no evidence that he was filming the monitors or was in danger of accidentally filming the monitors.  It was incompetent for the Federal Defendants to summon the City Defendants and illegally demand that Mocek stop filming, which led to his arrest

and prosecution.  The complaints by the federal defendants that Plaintiff had

engaged in disorderly conduct were flat-out false, and form the basis for liability to

the extent that Dilley and his colleagues relied on this information as the basis for

their reports and Mocek's arrest and prosecution.

At a minimum, the federal defendants should have halted their complaints

about recording, completed their determination about whether to let him board the

plane, and then either allow him to enter the screened area or ask him to leave the

airport. Only if it was determined that he was violating a law or regulation by

recording or by refusing to comply with a requirement to leave the airport was it

appropriate to summon the police.  Until then, the Federal Defendants were asking

the City Defendants to enforce an unconstitutional demand, and made false

statements to effectuate the arrest.

Similarly, the City Defendants made an unconstitutional demand, and made

similar false statements to back up their arrest.

Pursuant to *Romero v. Fay*, the Defendants' behavior was not reasonable.

Nor did the Defendants use the "readily available" law and facts. *Kolender* and

*Hiibel* also "clearly establish" that Mocek had no duty to provide "credible and

reliable" ID.

## V. MUNICIPAL LIABILITY CLAIM SHOULD PROCEED, AS
## UNCONSTITUTIONAL ACTS ALLEGED

As unconstitutional policies, practices and conduct are properly alleged,

Plaintiff's municipal liability claim should go forward. As stated above, the

court's finding that Mocek did not allege the violation of any legally cognizable

right is incorrect. App.513-514. If any of these acts are protected by qualified

immunity, a cause of action against that municipal defendant would still be valid.

*Medina vs. City and County of Denver*, 960 F.3d 1493 (10th Cir. 1992); *Barber v.*

*City of Salem, Ohio,* 953 F.2d 232. (6th Cir. 1992).

## VI. DECLARATORY RELIEF CLAIM SHOULD GO FORWARD, AS CASE IS NOT MOOT

Plaintiff argues that the case is not moot, and the relief is appropriate. The

standard of review for denial of declaratory relief is *de novo. Hunt v. Bennett,* 17

F.3d 1263, 1265 (10th Cir. 1994).

The Supreme Court has made it clear that no "likelihood of recurrence" need

be shown if the injury suffered in the past has "continuing, present adverse

effects". *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). The classic

constitutional injury with such continuing present effects is injury to one's First

Amendment freedom of expression. Where a plaintiff's right to free speech has

been infringed in the past, the chilling effect on free speech is deemed to be a

sufficient continuing injury to merit standing to enjoin the unconstitutional statute

or policy.  See *Secretary of State of Maryland v. Joseph H. Munson Co.,* 467 U.S. 947, 956-957 (1984).

In *Meese v. Keene,* 481 U.S. 465, 472 (1987), the Court described the "chill" required for standing as "a claim of specific present objective harm or a threat of specific future harm..(The) government action need not have a direct effect on the exercise of First Amendment rights, (but) it must have caused or threaten to cause a direct injury to plaintiffs...The injury must be 'distinct and palpable'".  In *Meese,* the need to take affirmative steps to avoid harm to reputation constituted sufficient injury for standing purposes.  Thus, where police conduct deters expressive activity protected by the First Amendment, a "continuing, present adverse effect" is shown. Plaintiff should not have to demonstrate a likelihood that the unconstitutional conduct will recur, if the chilling effect of the past violations is justified by the realistic possibility that the violations will recur.

## VII. PLAINTIFF SEEKS LEAVE TO AMEND THE COMPLAINT

In any case, Plaintiff seeks leave to amend the complaint. Challenges to a motion to dismiss are reviewed *de novo.  Soc'y of Separationists v. Pleasant Grove City,* 416 F.3d 1239, 1240–41 (10th Cir. 2005).  Plaintiff seeks to amend the complaint to include additional facts, as discussed above.  Plaintiff also seeks leave

to amend the complaint to include a transcript of the conversations between

Plaintiff and Defendants.  A copy of that transcript is included as App.316-338.

## VIII. PLAINTIFF REQUESTS APPOINTMENT OF A NEW DISTRICT COURT JUDGE

The court made various rulings on the Federal Defendants' motion, such as

that Defendant Dilley had probable cause to arrest Plaintiff.  App.238. Prior to any

briefing on the liability of the City Defendants, the court issue rulings that the City

Defendants had reasonable suspicion that Mocek was engaging in criminal conduct

and that the City Defendants had probable cause to arrest Mocek. App.236-244.

Although the court said that it would not use these interlocutory rulings in its

final ruling in favor of the City Defendants, it is obvious that the court prematurely

decided these matters without seeking any briefing from Mocek's counsel.

For the errors cited above and throughout this brief, Mocek respectfully

requests that this Court appoint a new district court judge preside in future

proceedings.

## CONCLUSION

The court is respectfully requested to reverse the above-cited rulings of the

district court, remand the proceedings to the district court, and appoint a new

judge.

Dated:  September 4, 2014


_____/s/_____
WILLIAM M. SIMPICH

JAMES WHEATON
MARY JO BOELCKE

Attorneys for Plaintiff
PHILIP MOCEK

## **REQUEST FOR ORAL ARGUMENT**

Oral argument is requested in this matter due to the importance of the issues involved relating to Plaintiff's constitutional rights under the First and Fourth Amendment and to address any questions the Panel may have after reviewing the briefs and record submitted.

# CERTIFICATE OF COMPLIANCE WITH RULE 32(a)
Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    [X ] this brief contains 12,673 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [X ] this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point font, Times New Roman.

Date: September 4, 2014

_____

William M Simpich
Attorney for Appellant, Phillip Mocek
1736 Franklin St, 10th Floor, Oakland, CA 94612
email: bismpich@gmail.com
(510) 444-0226

**COC-1** Certificate of Compliance – 6/2011

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

### APPELLANT'S OPENING BRIEF

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of McAfee Security Scanner, and according to the program are free of viruses.

/s/

WILLIAM M SIMPICH

Attorney for Appellant

CDS-1  Certificate of Digital Submission  8/2013

## CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2014,  I electronically filed the foregoing using the court's CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| Jeffrey L. Baker , The Baker Law Firm | jeff@bzjustice.com |
| Manuel Lucero, US Attorney's Office | manny.lucero@usdoj.gov |
| Edward J Martin, US Department of Justice | edward.martin2@usdoj.gov |
| Renni Zifferblatt, Baker Law Firm | renni@bzjustice.com |

I hereby certify that on September 4, 2014, I have mailed or served the foregoing by mail, postage pre-paid to the following:

Jeffrey L. Baker
Renni Zifferblatt
The Baker Law Firm
20 First Plaza NW Suite 402
Albuquerque, NM 87102

Manuel Lucero
US Attorney's Office
District of New Mexico
PO Box 607
Albuquerque, NM 87103

Edward J Martin
US Department of Justice
Civil Division
PO Box 7146
Washington, DC 20044

Date: September 4, 2014

William M Simpich
Attorney for Appellant, Phillip Mocek
1736 Franklin St, 10th Floor, Oakland, CA 94612
email: bismpich@gmail.com
(510) 444-0226