IN THE UNITED STATES COURT OF
APPEALS FOR THE TENTH CIRCUIT
_____

No. 14-2063
_____

PHILLIP MOCEK,

Plaintiff-Appellant,

v.

CITY OF ALBUQUERQUE, *et al.*,

Defendants-Appellees.
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
DISTRICT COURT NO. 11-CV-1009
JUDGE JAMES O. BROWNING
_____

**BRIEF FOR THE INDIVIDUAL FEDERAL APPELLEES**
_____

ORAL ARGUMENT IS NOT REQUESTED
_____

Joyce R. Branda
  Acting Assistant Attorney General

Damon Martinez
  United States Attorney

Rupa Bhattacharyya
  Director, Torts Branch
Andrea W. McCarthy
  Senior Trial Counsel

H. Thomas Byron III
   Appeals Counsel


Edward J. Martin
Senior Trial Attorney, Torts Branch,
Civil Division
United States Department of Justice
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
Tel: 202-616-1024

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... v

GLOSSARY ................................................................................................ xi

STATEMENT OF RELATED CASES .......................................................... 1

INTRODUCTION ........................................................................................ 1

STATEMENT OF JURISDICTION ............................................................. 2

STATEMENT OF THE ISSUES ................................................................. 3

STATEMENT OF THE CASE ..................................................................... 4

   I.   Complaint ........................................................................................ 4

   II.  District Court Ruling ..................................................................... 10

SUMMARY OF ARGUMENT ................................................................... 12

STATEMENT OF THE STANDARD OF REVIEW ................................... 14

ARGUMENT ............................................................................................. 14

   I. THE *BIVENS* CLAIMS AGAINST THE TSOs ARE BARRED BY
      QUALIFIED IMMUNITY. ................................................................ 14

     A.  Mocek's Allegations Do Not Establish That Any TSO Violated
        His Clearly Established Rights Under The First Amendment. ......... 15

       1.  Mocek Has Not Alleged That He Was Engaged In A
          Constitutionally Protected Activity................................................ 17

       2.  The TSOs Did Not Cause Mocek's Arrest or the Other Adverse
          Actions Alleged in His First Amendment Retaliation Claim. ...... 28

       3.  Mocek Also Failed to Plausibly Plead that the TSOs Acted With
          A Retaliatory Motive.................................................................... 35

       4.  Mocek's Has Not Pled A Violation of Clearly Established Law
          Under The First Amendment. ....................................................... 36

B.  Mocek's Allegations Do Not Establish That The TSOs Violated
His Clearly Established Rights Under The Fourth Amendment...... 43

1.  Mocek's Allegations Fail to Allege a Fourth Amendment
Violation by the TSOs.................................................................. 43

2.  Mocek's Allegations Do Not Constitute a Violation of Clearly
Established Law Under the Fourth Amendment........................... 50

II.  THE DISTRICT COURT CORRECTLY DENIED MOCEK'S
REQUEST FOR DECLARATORY RELIEF..................................... 53

III.  MOCEK'S REQUEST TO AMEND HIS COMPLAINT IS
IMPROPER ........................................................................................ 57

IV. THERE IS NO JUSTIFICATION FOR MOCEK'S REQUEST
FOR  A NEW DISTRICT COURT JUDGE....................................... 59

CONCLUSION........................................................................................ 60

STATEMENT REGARDING ORAL ARGUMENT ................................ 61

CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF
APPELLATE PROCEDURE 32(A)........................................................ 62

CERTIFICATE OF DIGITAL SUBMISSION ........................................ 63

CERTIFICATE OF SERVICE ................................................................ 64

# TABLE OF AUTHORITIES

Cases

*Albright v. Rodriguez*,
  51 F.3d 1531 (10th Cir. 1995) ................................................................. 14

*Already, LLC v. Nike, Inc.*,
  133 S. Ct. 721 (2013) ............................................................................. 57

*American Dental Ass'n. v. Cigna Corp.*,
  605 F.3d 1283 (11th Cir. 2010) ............................................................. 35

*Anderson v. Creighton*,
  483 U.S. 635 (1987) ................................................................. 14, 15, 42

*Ashcroft v. Al-Kidd*,
  131 S. Ct. 2074 (2011) ..................................................................... 14, 38

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2011) ...................................................................... passim

*Atkinson v. O'Neill*,
  867 F.2d 589 (10th Cir. 1989) ................................................................. 55

*Bame v. Dillard*,
  637 F.3d 380 (D.C. Cor. 2011) ........................................................ 42, 52

*Bell Atlantic v. Twombly*,
  550 U.S. 544 (2007) ................................................................................. 32

*Bivens v. Six Unknown Named Agents of the Bureau of Narcotics*,
  403 U.S. 388 (1971) ...................................................................... passim

*Board of Airport Com'rs of City of Los Angeles v. Jews for Jesus, Inc.*,
  482 U.S. 569 (1987) ................................................................................. 21

*Bork v. Carroll*,
  449 F. App'x. 719 (10th Cir. 2011) ................................................... 56, 57

*Brousseau v. Hagen*,
  543 U.S. 194 (2004) .......................................................................... 42, 51

*Brown v. Texas*,
  443 U.S. 47 (1979) ................................................................................... 47

*Calderon v. Kansas Dept. of Social & Rehab Serv.*,
  181 F.3d 1180 (10th Cir. 1999) ............................................................... 59

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ................................................................................... 57

v

*Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*,
   473 U.S. 788 (1985) .................................................................. 27

*Cruz v. City of Laramie, Wyo.*,
   239 F.3d 1183 (10th Cir. 2001).................................................. 52

*Davis v. Sherer*,
   468 U.S. 183 (1984) .................................................................. 38

*Dry v. United States*,
   235 F.3d 1249 (10th Cir. 2000).................................................. 56

*F.D.I.C. v. Meyer*,
   510 U.S. 471 (1994) .................................................................. 56

*Farmer v. Perrill*,
   275 F.3d 958 (10th Cir. 2001).................................................... 56

*Fordyce v. City of Seattle*,
   55 F.3d 436 (9th Cir. 1995)........................................................ 20

*General Ry. Signal Co. v. Corcoran*,
   921 F.2d 700 (7th Cir. 1991)...................................................... 55

*George v. Rehiel*,
   738 F. 3d 562 (3rd Cir. 2013)............................................. passim

*Glik v. Cunniffe*,
   655 F.3d 78 (1st Cir. 2011) ......................................... 20, 21, 42

*Green v. Nocciero*,
   676 F.3d 748 (8th Cir. 2012)...................................................... 29

*Hafner v. Melo*,
   502 U.S. 21 (1991) .................................................................... 54

*Hall v. Witteman*,
   584 F.3d 859 (10th Cir. 2009).................................................... 59

*Harlow v. Fitzgerald*,
   457 U.S. 800 (1982) .................................................................. 14

*Hartman v. Moore*,
   547 U.S. 250 (2006) ....................................................... 33, 34, 35

*Hunter v. Bryant*,
   502 U.S. 224 (1991) .............................................................. 15, 38

*Int'l Soc. For Krishna Consciousness, Inc. v. Lee*,
   505 U.S. 672 (1992) ......................................... 19, 20, 21, 22

*Iowa Tribe of Kan. & Neb. v. Salazar*,
  607 F.3d 1225 (10th Cir. 2010) ................................................................. 55

*James v. Chavez*,
  511 F. App'x 742 (10th Cir. 2013) ........................................................ 46

*Kelly v. Borough of Carlisle*,
  622 F.3d 248 (3rd Cir. 2010) ..................................................... 21, 41, 42

*Klen v. City of Loveland*,
  661 F.3d 498 (10th Cir. 2011) ................................................... 16, 27, 28

*Malley v. Briggs*,
  475 U.S. 335 (1986) ................................................................... 15, 38

*Marcus v. Kan. Dep't of Revenue*,
  170 F.3d 1305 (10th Cir. 1999) ................................................................. 56

*Martinez v. Carson*,
  697 F.3d 1252 (10th Cir. 2012) ................................................................. 52

*McBeth v. Himes*,
  598 F.3d 708 (10th Cir. 2010) ................................................... 33, 34, 35

*Merida Delgado v. Gonzales*,
  428 F.3d 916 (10th Cir. 2005) ................................................................. 55

*Michell v. Maynard*,
  80 F.3d 1433 (10th Cir. 1996) ................................................................. 60

*Mitchell v. Forsyth*,
  472 U.S. 511 (1985) ................................................................... 14, 37

*Procter & Gamble Co. v. Haugen*,
  427 F.3d 727 (10th Cir. 2005) ................................................................. 60

*Reichle v. Howards*,
  132 S. Ct. 2088 (2012) ................................................................... 39, 40

*Rendon v. Transp. Sec. Admin.*,
  424 F.3d 475 (6th Cir. 2005) ................................................................... 22, 23

*S.H.A.R.K. v. Metro Parks Serving Summit*,
  499 F.3d 553 (6th Cir. 2007) ................................................................... 18

*Saucier v. Katz*,
  533 U.S.194 (2001) ................................................................... 37, 51, 53

*Smith v. City of Cumming*,
  212 F.3d 1332 (11th Cir. 2000) ................................................................. 20, 21

*Smith v. Plati*,
  258 F.3d 1167 (10th Cir. 2001) .......................................................... 17, 39

*Szymecki v. Houck*,
  353 F. App'x. 852 (4th Cir. 2009) ...................................................... 21, 41

*Thomas v. Kaven*,
  765 F.3d 1183 (10th Cir. 2014) ............................................................. 13

*Tobey v. Jones*,
  706 F.3d 379 (4th Cir. 2013) .................................................... 30, 31, 32, 51

*Trackwell v. United States Government*,
  472 F.3d 1242 (10th Cir. 2007) .............................................................. 56

*Trask v. Franco*,
  446 F.3d 1036 (10th Cir. 2006) .............................................................. 52

*United States v. Harmon*,
  871 F. Supp. 2d 1125 (D.N.M. 2012)
  *aff'd* 742 F.3d 451 (10th Cir. 2014) ........................................................ 49

*United States v. Pack*,
  612 F.3d 341 (5th Cir. 2010) ............................................................ 48, 49

*United States v. Sears, Roebuck & Co.*,
  785 F.2d 777 (9th Cir. 1986) ................................................................ 60

*United States v. Torres-Castro*,
  470 F.3d 992 (10th Cir. 2006) ............................................................... 50

*United States v. Vercher*,
  358 F.3d 1257 (10th Cir. 2004) .............................................................. 48

*United States v. Wardlow*,
  528 U.S. 119 (2000) ......................................................................... 48

*Whiteland Woods, L.P. v. Township of West Whiteland*,
  193 F.3d 177 (3rd Cir. 1999) ................................................................ 18

*Wilcox v. Homestake Mining Co.*,
  619 F.3d 1165 (10th Cir. 2010) .......................................................... 46, 53

*Wilson v. Layne*,
  526 U.S. 603 (1999) ................................................................. 37, 43, 52

*Worrell v. Henry*,
  219 F.3d 1197 (10th Cir. 2000) .............................................................. 16

*Zemel v. Rusk*,
   381 U.S. 1 (1965) ............................................................ passim

*Zia Trust Co. ex rel. Causey v. Montoya*,
   597 F.3d 1150 (10th Cir. 2010) ................................................ 38

Statutes

28 U.S.C. 1291 ........................................................................ 2

28 U.S.C. §1331 ............................................................... 2, 55

28 U.S.C. §1332 ............................................................... 2, 55

28 U.S.C. § 1343(a) (4) ...................................................... 2, 55

28 U.S.C. § 1343 ............................................................... 2, 55

28 U.S.C. § 2201 ...................................................................... 2

42 U.S.C. § 1983 .................................................................... 56

49 U.S.C. § 114(h)(1) & (4) ................................................... 36

49 U.S.C. § 44903(j)(2)(C) ................................................... 36

N.M. Stat. Ann. 1978 § 30-20-1 ........................................... 49

N.M. Stat. Ann. 1978 § 30-22-3 ........................................... 47

Rules

Fed.R.Civ.P. 7(b)(1) ............................................................. 59

Fed. R. App. P. 32 ................................................................. 63

Regulations

49 C.F.R. § 1540.105 ............................................................ 27

49 C.F.R. § 1540.107(c) ........................................................ 36

49 C.F.R. § 1540.109 ............................................................ 25

49 C.F.R. § 1542.215 ............................................................ 25

49 C.F.R. part. 1560 ............................................................. 36

*Civil Aviation Sec. Rules*,  67 Fed. Reg. 8340 (Feb. 22, 2002) ............. 25, 27

Other Authorities

10B Charles Alan Wright & Arthur R. Miller, Federal Practice and
Procedure § 2766 (3d ed. 2012) ................................................................. 54

6A Charles Alan Wright & Arthur R. Miller, Federal Practice and
Procedure, § 1489 (3rd ed. 2014) .............................................................. 58

William L. Prosser, *Law of Torts*, 47 (4th ed.1971) ..................................... 45

# GLOSSARY

| | |
|---|---|
| TSA | Transportation Security Administration |
| TSO | Transportation Security Administrative Officer |
| Albuquerque Sunport | Albuquerque International Sunport Airport |
| AAPD | Albuquerque Aviation Police Department |

## STATEMENT OF RELATED CASES

There are no prior or related appeals.

## INTRODUCTION

Mocek seeks to hold three Transportation Security Administration (TSA) officers (TSOs) personally liable for allegedly violating his First and Fourth Amendment rights as they sought to verify his identity at a passenger screening checkpoint at the Albuquerque International Sunport Airport (Albuquerque Sunport). Mocek intentionally challenged the TSA's security procedures by refusing to provide identification prior to boarding a plane at the Albuquerque Sunport. After one of the TSOs initiated additional security screening measures applicable when a passenger lacks proper identification, Mocek began video recording the additional screening process. When Mocek refused the TSOs' repeated requests to stop recording, the TSOs asked for assistance from local authorities. The local police requested that Mocek comply with the TSOs' requests or be removed from the airport. After Mocek refused to comply, the police asked for his identification several times. After again failing to comply with the police, Mocek was arrested on charges that included concealing his identity.

## STATEMENT OF JURISDICTION

Plaintiff Phillip Mocek filed this action under *Bivens* v. *Six Unknown Named Agents of the Bureau of Narcotics*, 403 U.S. 388 (1971), against three TSOs, Jonathan Breedon, Gerald Romero and Anthony Schreiner, seeking damages for alleged violations of his First and Fourth Amendment rights.[1]   Mocek also sought declaratory relief against these federal defendants in their official capacity.[2]   Mocek invoked the district court's jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332, 1343 and 2201. *See* Appendix (App.) at 10.

On January 14, 2013, the district court issued a Memorandum Opinion and an Order granting the individual federal defendants' motion to dismiss, holding that the complaint failed to state a claim upon which relief can be granted and that the district court had no jurisdiction over Mocek's declaratory relief claims. Final judgment was entered for all of the defendants on February 28, 2014, after the district court granted the City of

---

[1]  Individual federal defendant Jonathon Breedon was a lead TSO at the time of the incident, while defendant Anthony Schreiner was a Supervisory TSO and the defendant Gerald Romero was a Transportation Security Manager. For ease of reference, this brief will refer to them as TSOs.

[2]  Mocek's remaining claims solely challenge the conduct of the local defendants.

Albuquerque defendants' motion to dismiss.[3]  Mocek filed a notice of appeal

on April 28, 2014.  This Court has jurisdiction pursuant to 28 U.S.C. 1291.

## STATEMENT OF THE ISSUES

1.  Whether the TSOs are entitled to qualified immunity because
Mocek failed to allege a First Amendment violation, and the alleged
conduct, requesting that Mocek not record additional screening procedures
at an airport passenger screening checkpoint and asking for assistance from
local police when Mocek refused this request, is not a clearly established
constitutional violation.

2.  Whether the TSOs are entitled to qualified immunity because
Mocek failed to allege a violation of the Fourth Amendment, and merely
summoning local police officers when Mocek refused to stop filming
additional security measures at an airport passenger screening checkpoint is
not a clearly established constitutional violation.

3.  Whether Mocek failed to demonstrate standing or any
jurisdictional basis for the declaratory relief he seeks.

4.  Whether this Court should permit Mocek to amend his Complaint
or appoint a new district court judge.

---

[3]  In this same appeal, Mocek also seeks review of the district court's
dismissal of the claims against the local defendants.  Pursuant to 10th Cir. R.
31.3(D), those defendants have filed a separate brief.

3

## STATEMENT OF THE CASE

### I.    Complaint

Mocek identifies himself as "an outspoken advocate of free software, open standards, government transparency, drug policy reform, and civil liberties." App. at 8-9. He began to "harbor reservations" regarding the TSA's "passenger identification procedures" in 2007 and began "refraining from showing documentation of identity when flying." *Id.* at 9. Mocek believed that the "TSA's airline passenger identification procedures were designed to serve two purposes: (1) airline revenue production (airlines are now able to resell tickets when passengers fail to make their flights), and (2) facilitation of a system of restriction of movement based on government blacklists." *Id*. at 13.

Mocek always carried identification, but he flew without showing his identification by presenting "just the required boarding pass" to the requesting TSO. *Id.* Typically, the TSO would request that Mocek show documentation of his identity, and Mocek would "inform the TSA agent that he did not have any I.D. to show him." *Id.* Once the TSO realized he did not intend to provide identification, Mocek was typically "diverted to a separate line to await assistance and additional questioning from another TSA agent." *Id.* During a number of trips in which Mocek "desired a

4

minimum delay" he "presented his I.D. to move through security quickly with minimum hassle and risk of delay." *Id.*

According to Mocek, in 2008 the TSA changed its airline passenger identification policy. Passengers who "willfully refused" to show identification would not be allowed to pass through the security checkpoint, but passengers whose identification was misplaced or stolen "would be allowed to pass through if they cooperated with alternative procedures." *Id.* at 14.

In 2009, "Mocek began researching TSA's regulations and policies regarding prohibitions on photography, video recording, and filming at airport" passenger screening checkpoints. *Id.* at 9. Based on his research of a TSA website, Mocek concluded that the TSA generally permits photography at their security checkpoints as long as there is no photography of the monitors[4] and the photography does not interfere "with the screening process or slow [ ] things down." *Id.* at 15. Mocek claims that a TSA employee at Albuquerque Sunport informed him that there were no state or city laws prohibiting photography in public areas of the airport, that a screening check point is a "'restricted area' and 'just for ticketed

---

[4]  During passenger screening, TSOs examine x-ray images, displayed on monitors, of passengers' personal property, to detect and prevent weapons, explosives and other prohibited items from being taken into the secure area.

5

passengers,'" and that "advance coordination would need to be made" to "film at or near the TSA checkpoint." *Id.* at 16. The TSA employee explained that "advanced coordination would allow TSA to advise law enforcement officers (LEOs) stationed at the checkpoint of the filming." *Id.*

Following an additional inquiry from Mocek, the TSA employee indicated that the information she provided was a "recommendation" and that individuals are encouraged "to contact TSA in advance so we can facilitate photography." *Id.* Mocek does not allege that he tried to coordinate with TSA officials prior to his filming at the screening checkpoint.

On November 15, 2009, Mocek traveled to Albuquerque Sunport for his return flight to Seattle. *Id.* at 17. Prior to arriving at the TSA security checkpoint, he handed his only identification, a Washington State driver's license, to his friend and traveling companion. *Id.* Mocek then approached the podium where TSO Martinez was checking documents, presented his boarding pass, and was asked for identification. *Id.* Mocek answered "that he did not have any form of I.D." and that it was his understanding that he only had to produce a boarding pass. *Id.* Mocek was then directed to stand in a different line. *Id.*

TSO Breedon then took Mocek's boarding pass and asked if he had anything else that might help verify his identity such as a credit card or other

identification.  *Id*.  Mocek responded that he did not think he was required to provide identification.  *Id*. According to Mocek, TSO Breedon stated Mocek "was correct and asked if he could verify his identity in another way."  *Id*. Mocek "again stated that he would not provide anything because it was his belief that he was not required to." *Id*.  TSO Breedon then told Mocek "that he would contact the TSA's Security Operations Center, which would try to verify his identity, and if they could not, Mocek would not be allowed to proceed through the security checkpoint." *Id*. at 17-8.

At that point, Mocek began using his camera to video record his interactions with TSO Breedon, including "what he perceived to be an atypical alternative identification policy." *Id*. at 18.  TSO Breedon told him that he would "need to stop filming," but "Mocek responded that he did not believe that filming of a publically accessible area was illegal" and continued recording.  *Id*.  TSO Breedon attempted to take Mocek's camera, and told him no photography or videotaping was permitted at a security checkpoint.  *Id*.  TSO Breedon then called for police assistance.  *Id*.

While awaiting the police, TSA supervisors Schreiner and Romero arrived at the screening checkpoint. *Id*. TSO Breedon briefed TSO Schreiner on the events that just took place. *Id*. TSO Romero then had a conversation

with Mocek in which he asked Mocek to put his camera "down for now" repeatedly, but Mocek refused and continued recording. *Id.* at 18 and 23.

Three members of the AAPD, Officers Dilley, Wiggins and De La Pena, arrived and were told by an unidentified TSA employee that Mocek was causing a disturbance and would not put down his camera. *Id.* Officer Dilley instructed Mocek to "comply with the TSA agent's instructions or else he would be escorted out of the airport." *Id*. at 19. Mocek asserted that he had not raised his voice, was not attempting to hinder TSA employees from doing their job, and that he intended to comply with all TSA rules and regulations. *Id.* When Officer Dilley reiterated that Mocek should comply or be escorted out of the airport, Mocek indicated that he did not believe there was a rule that barred him from using a camera in a publically accessible area of the airport. *Id.* Officer Wiggins stated that they were in a "federal checkpoint and that Mocek could not film there." *Id.* Mocek replied, "I've checked into it and I know that I *can* do it here." *Id.* Officer Wiggins replied, "Well, you can be arrested, then you can check into it more." *Id.*

After being told by Officer De La Pena that Mocek was also refusing to show his identification, Officer Dilley said, "Let's go, sir. You're leaving the airport. You're being escorted out at this point. Let's go. And if you

refuse, we'll arrest you. Let's go." *Id.* Mocek responded, "I don't understand." *Id.*

"Dilley then changed his mind about escorting Mocek out of the airport, stating that he was going to need to see Mocek's I.D. or else he was going to arrest Mocek for concealing identity." *Id.* Mocek stated that he did not have any identification to show Officer Dilley. *Id.* Officer Dilley informed Mocek that he was part of a criminal investigation and was required to provide identification. *Id.* When Mocek then asked what he was being investigated for, Officer Dilley responded "disturbing the peace." *Id.* Mocek denied disturbing the peace and Officer Dilly reiterated for a third time that Mocek was required to produce his identification. *Id.* Mocek responded that he was going to remain silent and wanted to talk to an attorney. *Id.* Officer Dilley then placed Mocek under arrest and escorted him to the AAPD Office for processing. *Id.* at 20.

Following Mocek's arrest, his belongings were searched by the police and he was placed in a holding cell. *Id.* Officer Dilley's incident report indicated that Mocek committed a "disturbance by Disorderly conduct," refused to identify himself, and refused to comply with a criminal trespass order. *Id.* at 22. Following his release, Mocek returned to the Sunport's police office to retrieve his belongings. *Id.* at 27. Mocek claims that footage

of the incident on his video camera had been deleted, but Mocek was able to recover the information.  *Id.*

Mocek was charged with: (1) disorderly conduct; (2) concealing identity with intent to obstruct, intimidate, hinder or interrupt; (3) resisting, obstructing or refusing to obey an officer; and (4) criminal trespass.  *Id.* at 10.  Ultimately, a jury acquitted Mocek.  *Id.*

## II.    District Court Ruling

After full briefing and a hearing, the district court granted the TSOs' motion to dismiss the Complaint for failure to state a claim. The court held that Mocek failed to allege "sufficient facts to show that the TSOs conduct was unreasonable." *Id.* at 218. Specifically, the court found no First Amendment violation because Mocek did not allege any view-point discrimination, and "[p]rohibiting Mocek from recording an alternative screening procedure is [even] more reasonable than the prohibition upheld in Int'l Soc. For Krishna Consciousness, Inc. v. Lee, given . . . the screening checkpoint's purpose to maintain passenger safety and the TSOs' desire to keep Mocek from documenting the process so as to develop a way to evade TSA screening protocol." App. at 229.

The district court also held that Mocek's alleged First Amendment violations do not violate clearly established law because "neither the Tenth

Circuit nor the Supreme Court has found that Mocek's right to gather news in this context is clearly established." *Id.* at 232. The court stated that the "Supreme Court has upheld reasonable limitations on First Amendment conduct in airport terminals, and thus a reasonable TSA agent in the TSO's shoes would not likely understand that telling Mocek to stop recording and subsequently summoning the police when he refused to comply violated his rights." *Id.* at 233.

As to the plaintiffs' Fourth Amendment claims, the district court held that the TSOs' summoning of the AAPD officers was not the proximate cause of any illegal arrest and search. *Id.* at 245. The court concluded that based on what was reported and what they viewed concerning his behavior, the AAPD officers had "reasonable suspicion that Mocek was engaging in criminal activity at the screening checkpoint" and therefore "could legally demand Mocek produce identification." *Id.* at 244. Mocek's "failure to produce that identification thus gave the AAPD officers probable cause to arrest him." *Id.*[5]

The district court also held that Mocek failed to allege a clearly established Fourth Amendment violation because the TSOs' actions were

---

[5] The district court also found that Mocek has not stated a claim for excessive force. App. at 245. Mocek has not challenged that ruling in his opening brief.

reasonable and not tortious. Under Tenth Circuit law at the time, the TSOs'
actions of summoning the AAPD officers could not have set in motion a
series of events which they knew or should have known would lead to a
violation of Mocek's constitutional rights. On that basis as well, the district
court recognized that the TSOs were entitled to qualified immunity as to
Mocek's Fourth Amendment allegations. *Id.*

Finally, the district court held that it lacked subject matter jurisdiction
to entertain Mocek's claims for declaratory relief against the United States
because Mocek failed to cite a waiver of the federal government's sovereign
immunity for this claim. *Id*. at 253.

## SUMMARY OF ARGUMENT

The individual federal defendant TSOs are entitled to qualified
immunity in this *Bivens* action because they did not violate Mocek's
constitutional rights, much less any clearly established constitutional rights.
Mocek has not plausibly pled that the TSOs violated his First Amendment
rights because the TSOs' request that he stop recording additional screening
procedures at an airport passenger screening checkpoint was not an
unreasonable restraint on any right guaranteed by the First Amendment. Nor
can he make out a First Amendment retaliation claim based on the TSOs'
requesting assistance from the AAPD officers. Further, any right to gather

news in an airport security checkpoint or to record the secondary screening procedures at that location was not clearly established at the time of the incident and thus the TSOs are entitled to qualified immunity on Mocek's First Amendment Claim.

Additionally, Mocek has failed to plausibly plead that the TSOs personally participated in any alleged Fourth Amendment violations, or that he suffered such violation at the hands of the AAPD officers because the police had probable cause to arrest Mocek. Further, the TSOs' conduct did not violate clearly established law because their initial order for Mocek to cease recording was reasonable, and the TSA's established procedures contemplate summoning law enforcement when individuals disrupt or create a potential security risk at a TSA checkpoint.

Since Mocek has not suffered a constitutional violation, he is not entitled to declaratory relief and he lacks standing for this claim. In addition he has failed to plead a jurisdictional basis for his declaratory relief claim. Finally, Mocek has failed to provide any legal justification or factual support for his requests to amend his complaint and for the appointment of a new district court judge.

## STATEMENT OF THE STANDARD OF REVIEW

This Court reviews *de novo* the district court's ruling on a motion to dismiss on the basis of qualified immunity. *Thomas v. Kaven*, 765 F.3d 1183, 1190 (10th Cir. 2014) (citation omitted).

## ARGUMENT

### I.    THE *BIVENS* CLAIMS AGAINST THE TSOs ARE BARRED BY QUALIFIED IMMUNITY.

The district court correctly dismissed the first and third counts of Mocek's Complaint because the TSOs are protected by qualified immunity. Qualified immunity shields government officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In order to overcome a defense of qualified immunity, a plaintiff must allege facts showing that each individual defendant (1) "violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. Al-Kidd,* 131 S. Ct. 2074, 2080 (2011); *see also Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995) ("Once a defendant pleads qualified immunity, the plaintiff initially bears a heavy two-part burden.").

14

Qualified immunity is intended to shield officials from the harassment of litigation as much as the fear of damages. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). It thus provides "an *immunity from suit* rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Accordingly, the Supreme Court has repeatedly stressed that qualified immunity defenses should be resolved at the earliest possible stage of litigation. *See*, *e.g.*, *Hunter v. Bryant*, 502 U.S. 224 (1991) (*per curiam*); *Anderson*, 483 U.S. at 646 n.6.

The qualified immunity defense raises a high bar, protecting government officials from suit unless they are "plainly incompetent or . . . knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). To determine whether the official could have reasonably believed that his or her conduct was lawful, courts examine the state of the law at the relevant time, and the information available to the defendants in the case. *Anderson*, 483 U.S. at 641.

### A. Mocek's Allegations Do Not Establish That Any TSO Violated His Clearly Established Rights Under The First Amendment.

In Count I of his Complaint, Mocek claimed that the TSOs violated the Constitution when they summoned law enforcement in retaliation for his "video and audio recording" at the TSA passenger screening checkpoint

resulting in his arrest and the seizure of his belongings. App. at 28-29. Although not stated in his Complaint, Mocek now asserts that he was involved in "gathering information" as an exercise of purported First Amendment rights. Appellant's Brief at 27. The district court correctly recognized, however, that, "[w]hether construed as a right to newsgathering or to record police conduct in public, the Tenth Circuit or Supreme Court has not recognized either right in a factual situation similar to that set forth in Mocek's Complaint." App. at 222.[6]

To establish a First Amendment retaliation claim, outside the employment context,  a plaintiff must establish the following elements: "(1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's action caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Klen v. City of Loveland*, 661 F.3d 498, 508 (10th Cir. 2011) (*citing Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000)).  In this case, Mocek has failed to allege any of the elements of a First Amendment retaliation claim.

---

[6]  Although the party's briefs discuss a number of cases involving the recording of *police* conduct, it is important to note, as the district court did, that the TSOs are not law enforcement officers. App. at 101; *see also George v. Rehiel,* 738 F.3d 562, 582 n.20 (3rd Cir. 2013).

### 1. Mocek Has Not Alleged That He Was Engaged In A Constitutionally Protected Activity.

a.  Mocek claims a right to gather news or record government officials performing their duties at the TSA passenger screening checkpoint, while a passenger is undergoing additional screening. But no court has ever held that such a right exists. The absence of any such authority suffices to show that there was no clearly established right that the TSOs could have violated. This Court has recognized that there "is no general First Amendment right of access to all sources of information within governmental control."  *Smith v. Plati*, 258 F.3d 1167, 1178 (10th Cir. 2001).  *See also Zemel v. Rusk*, 381 U.S. 1, 17 (1965) ("The right to speak and publish does not carry with it the unrestrained right to gather information.").

Even assuming that Mocek's use of video recording equipment to record the TSOs' additional screening constituted expressive conduct protected by the First Amendment, Mocek has failed to establish the first prong of a First Amendment retaliation claim because the TSOs' actions, as alleged, constituted a reasonable limitation on Mocek's activities.  Further, Mocek has not alleged any viewpoint discrimination, or even that he had any

intent to express a viewpoint of any kind when he undertook to record the screening process.[7]

As explained below, the TSOs' request that Mocek stop recording the additional screening procedures, and their decision to summon law enforcement when he refused to do so and thereby created a disturbance, was reasonable in the circumstances. Such a reasonable restriction on expressive conduct is permissible under the First Amendment, assuming there is any constitutional right to record the screening process at all. And even under the analysis applicable to a public forum (an approach the Supreme Court has specifically rejected for airport terminals), the actions of the TSOs would have been permissible content-neutral restrictions on the time, place and manner of speech.[8]

---

[7] Mocek admits that he "did not vocalize his intent." Appellant's Brief at 35.

[8] Mocek, for the first time, claims that it is "unclear" whether the "forum analysis even applies in cases dealing with newsgathering." Appellant Brief at 34 n.2. However, Mocek does not indicate what analysis he believes is appropriate. Instead he merely cites two decisions that do not support his case. The first, *S.H.A.R.K. v. Metro Parks Serving Summit*, 499 F.3d 553, 560 (6th Cir. 2007) adopted a rational basis analysis similar to the analysis for a nonpublic forum. The second case, *Whiteland Woods, L.P. v. Township of West Whiteland*, 193 F.3d 177, 184 (3rd Cir. 1999), is even less helpful for Mocek because it concluded that the plaintiff's "right of access to Planning Commission meetings did not create a federal constitutional right to videotape the meetings."

If Mocek's conduct – recording the activities of TSOs in the airport passenger screening area – was protected speech, then the appropriateness of any restriction on that conduct should be measured by established precedent governing government actions in a nonpublic forum. As found by the district court, attempting to prohibit Mocek from recording an additional screening procedure is even more reasonable than the prohibition upheld in *Int'l Soc. For Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 685 (1992), given the security purpose of the passenger screening checkpoint. In *Krishna Consciousness* the Court held that a ban on the plaintiffs' distribution of their organization's literature and solicitation of funds was reasonable in an airport terminal to avoid a disruptive effect on business and travelers. 505 U.S. at 674, 679-85. In contrast, the more limited restriction at issue here applies only to the extent the filming does not interfere with passenger safety and the TSOs' desire to keep Mocek from documenting the additional screening process so as to develop a way to evade TSA screening protocol.

Furthermore, Mocek's own inquiries revealed that had he notified the TSA in advance of his desire to film at an airport passenger screening checkpoint, his request may have been accommodated. Similarly, the Court in *Krishna Consciousness* found that the prohibition on solicitation inside an airport terminal was reasonable in part because the airport allowed

solicitation on "the sidewalk areas outside of the terminals." 505 U.S. at 684. In this case the TSA indicated that Mocek would generally have been allowed to record at the screening checkpoint if he followed the TSA employee's recommendation to coordinate the filming in advance. Moreover, there is no indication that his ability to record or gather news would have been limited in other areas of the airport terminal with less security concerns.

Mocek's brief fails to address the undisputed fact that his conduct occurred at a nonpublic forum and is thus subject to reasonable government restrictions on First Amendment activity. Appellant's Brief at 27-29. *See Krishna Consciousness*, 505 U.S. at 683. Instead, Mocek relies on out-of-circuit authority finding a right to record *police* activity in *public* places, including parks, streets and sidewalks, which are public forums. *See Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (holding that there is a "First Amendment right, subject to reasonable time, manner and place restrictions, to photograph or videotape police conduct."); *Glik v. Cunniffe*, 655 F.3d 78, 82-84 (1st Cir. 2011) (same; recording police activity in Boston Common, "the oldest city park in the United States and the apotheosis of a public forum"); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) (finding that recording a police protest march on the public streets and

sidewalks is included in the First Amendment right to "film matters of public interest.") *But see Kelly v. Borough of Carlisle*, 622 F.3d 248, 262 (3rd Cir. 2010) (holding that there was not a clearly established right to videotape police officers during a traffic stop.); s*ee also Szymecki v. Houck*, 353 F. App'x. 852, 853 (4th Cir. 2009) (unpublished) ("right to record police activities on public property was not clearly established in this circuit at the time of the alleged conduct"). Many of these cases also recognize that expressive activity is subject to reasonable time, place and manner restrictions. *See*, *e.g.*, *Smith*, 212 F.3d at 1333; *Glick*, 655 F.3d at 84; *Kelly*, 622 F.3d at 262. None of these cases deals with areas such as airport terminals, which have been recognized by the Court as nonpublic forums, or with security issues that are present at an airport passenger screening check point. In addition, TSOs are not themselves law enforcement officers, and their decision to summon law enforcement to address disruptive conduct was reasonable in the circumstances.

The Supreme Court has recognized that it is reasonable to regulate speech so as to avoid disruptions to the general airport environment.[9] Such

---

[9] *See Krishna Consciousness*, 505 U.S. at 682-83; *id*. at 686, 689 (O'Connor, J., concurring) (agreeing "that publically owned airports are not public fora" and that solicitation "disrupts passage"); *Board of Airport Com'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987) (striking down bar on all First Amendment activities at airport, but recognizing that

interests are significantly heightened within the passenger screening checkpoint-where disruption can directly create a serious security threat. *See Krishna Consciousness*, 505 U.S. at 681 (recognizing need for "a new inquiry [in each different type of transport facility] whether the transportation necessities are compatible with various kinds of expressive activity"). In addition, the TSA has a legitimate and substantial interest in "conduct[ing] the screening of passengers as efficiently as possible." *See Rendon v. Transp. Sec. Admin.*, 424 F.3d 475, 479 (6th Cir. 2005). Given the TSA's mission to identify individuals or materials at the screening checkpoint that threaten transportation security, coupled with the importance to that mission of avoiding disturbances and distractions, it is reasonable for TSOs to ask disruptive or suspicious passengers to cease filming at the checkpoint and, if necessary, refer them to law enforcement officers promptly for further inquiry. Therefore, Mocek has failed to state a plausible claim that the TSOs violated his First Amendment rights.

b.   The actions of the TSOs were reasonable in the circumstances presented here. The Complaint clearly indicates that Mocek intended to disrupt the screening process by willfully failing to follow TSA's screening

---

authority could "regulate expressive activity in the Central Terminal Area that might create problems such as congestion or the disruption of the activities of those who use LAX").

procedures and the TSOs' instructions. *See* App. at 13-14. During some previous trips, Mocek refused to provide TSOs with identification. *Id*. at 13. "Typically, once TSA staff realized he did not intend to present identification, Mocek would be diverted to a separate line to await assistance and additional questioning from another TSA agent." *Id*. During trips in which he desired a "minimum hassle and risk of delay" Mocek would provide identification to the TSA screeners. *Id*. Mocek alleges that in June of 2008 the TSA announced a new policy in which passengers like him who "willfully refuse to provide identification at security checkpoint[s] will be denied access to the secure areas of airports." *Id*. at 14.

Despite being aware of this policy, on November 15, 2009, Mocek gave his only identification, his driver's license, to his travel companion, and proceeded to the TSA screening checkpoint with only his boarding pass. *Id*. at 17. After he refused to provide identification, TSO Greg Martinez sent Mocek to a different line to be questioned concerning his identity by TSO Breedon. *Id*. at 17. Mocek was asked if he "had anything else to help identify him such as a credit card or other I.D." *Id.* "Mocek again stated that he would not provide anything because it was his belief that he was not required to." *Id.* TSO Breedon indicated he would contact the TSA's

Security Operations Center to attempt to verify Mocek's identity so that he could fly. *Id*. at 17-18.

Mocek then began video recording his interaction with TSO Breedon. *Id.* at 18. Mocek claims that he had previously reviewed airport photography policies and sent e-mails to TSA websites, from which he deduced that photography was permitted at TSA screening checkpoints as long as he did not photograph TSA monitors and his actions did not interfere with TSA operations. *Id*. at ¶¶ 15-16. In addition, Mocek alleges that a TSA Albuquerque official initially told him that the screening checkpoint was a "restricted area" and "just for ticketed passengers" and that advanced coordination was needed to photograph the area. *Id*. at 15-16. Mocek alleges that the same TSA official later told him that the advanced coordination was simply a recommendation that Mocek ignored. *Id*. at 16-17. Mocek refused TSO Breedon's request to "stop filming," i*d*. at 18, resulting in TSO Breedon requesting local police assistance and the involvement of two additional TSOs, Romero and Schreiner. *Id*. at 18-19, 28-29. Thus, before the local police arrived, Mocek's activities caused a disturbance that interfered with screening activities by requiring the involvement of at least

three additional TSOs, as well as whoever was on the phone at the TSA's Security Operations Center.[10]

Mocek's allegations support the conclusion that he created a disturbance and interfered with TSA screening by willfully refusing to provide his identification and by filming the additional screening process that ensued. The TSOs reacted reasonably to Mocek's actions. The TSA has appropriately recognized that when there is a disruption at the passenger screening checkpoint, a TSO "may . . . need to summon a checkpoint screening supervisor and law enforcement officer, taking them away from other duties," and that "[c]heckpoint disruptions potentially can be dangerous in these situations." *Civil Aviation Sec. Rules*, 67 Fed. Reg. 8340, 8344 (Feb. 22, 2002) (preamble to the final rule promulgating TSA's regulations); *see also* 49 C.F.R. § 1542.215 (requiring that airport operators provide law enforcement personnel). Disruptive actions like Mocek's can also create a security risk by potentially allowing others to evade scrutiny. *See Civil Aviation Sec. Rules*, 67 Fed. Reg. 8344 ("A [TSO] encountering such a situation [where a passenger is interfering with the TSO's job] must

---

[10] TSA regulations prohibit passengers from interfering with screening personnel who are performing their duties at airport screening checkpoints. 49 C.F.R. § 1540.109 ("No person may interfere with, assault, threaten, or intimidate [TSA] screening personnel in the performance of their screening duties under this subchapter.")

turn away from his normal duties to deal with the disruptive individual, which may affect the screening of other individuals").

Mocek admits he knew his actions would likely require additional screening and delay his processing through the checkpoint. *See* App. at 13-14. He also knew it was likely that his refusal to provide identification would result in him being denied access to the secure areas of the airport, including the departure gates. *Id.* In addition, both his refusal to provide identification and ensuing video recording of the screening process raised legitimate concerns about transportation security. While it may be clear now that Mocek had no intention of creating a disturbance for nefarious purposes, a reasonable TSA officer could not responsibly assume that Mocek was neither attempting to evade the security system nor testing the system responses for future operations.

In addition, TSOs must be concerned about the recording of procedures and the publicizing of possible vulnerabilities for others who aspire to evade security procedures, including the implementation of the TSA's watch list matching program.[11] While the TSA's policies generally do

---

[11] TSA screening includes confirming that the traveler who presents himself at the security checkpoint shares the same identity as the individual named on the boarding pass in order to ensure that all passengers have been appropriately vetted against federal watch lists pursuant to 49 U.S.C. § 44903(j)(2)(C). *See also* 49 U.S.C. § 114(h)(1) & (4) (providing the TSA

not prohibit all filming at the checkpoint, TSOs must have discretion to ask a passenger to refrain from filming and refer him or her to law enforcement officers when he or she refuses to comply with multiple TSO requests and causes a disruption. A rule allowing such disruptive behavior in the passenger screening area could readily be manipulated by individuals or groups that have malicious intent. *See Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 810 (1985) ("[T]he Government need not wait until havoc is wreaked to restrict access to a nonpublic forum."); *see also Civil Aviation Sec. Rules*, 67 Fed. Reg. 8344; 49 C.F.R. § 1540.105 ("[n]o person may . . . tamper or interfere with . . . [or] attempt to circumvent . . . any security system, measure, or procedure"). Under the circumstances described in the complaint, it was reasonable for TSO Breedon to take prompt action to end the disruption by requesting the presence of local police officers to ensure that Mocek was not a risk to the traveling public.

---

with the authority to cross-check passengers against databases identifying individuals who pose a threat to transportation or national security); 49 C.F.R. § 1540.107(c) ("[A]n individual may not enter a sterile area or board an aircraft if the individual does not present a verifying document . . ., when requested for the purposes of watch list matching . . ., unless otherwise authorized by TSA on a cases-by-case basis."); 49 C.F.R. part. 1560 (detailing TSA's watch list matching program, Secure Flight).

**2. The TSOs Did Not Cause Mocek's Arrest or the Other Adverse Actions Alleged in His First Amendment Retaliation Claim.**

Mocek also failed to meet the second prong of First Amendment retaliation, "that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity." *Klen*, 661 F.3d at 508. Although Mocek's Count I alleges that the TSOs "summoning law enforcement" led to the AAPD officers "unlawfully arresting [Mocek], seizing his camera and memory contained therein, searching his camera and its memory, attempting to destroy evidence by deleting the contents of the camera, and filing criminal charges against him," the factual recitations of his own complaint fail to support his conclusory allegations. App. at 28-9. Instead, the Complaint demonstrates that the TSOs were not responsible for the complained-of injuries, namely Mocek's arrest, the handling of his property, or the filing of criminal charges. *Id.* at 18-22, 27.

Mocek admits that the AAPD officers did not initially plan on arresting him. App. at 19. Officer Dilley twice told Mocek to "comply" with TSO's instructions or he "would be escorted out of the airport." *Id.* at 19. Even after one of the police officers indicated he was "causing a commotion" Mocek was given another opportunity to comply or be escorted out of the

airport. *Id.* Mocek was not arrested until after he refused to provide the police with his identification, despite being told he could be arrested for concealing his identity during an investigation. *Id.* The Complaint makes it clear that Officer Dilley, not the TSOs, made the decision to arrest Mocek. *Id.* at 19-20. ("Dilley *then changed his mind* about escorting Mocek out of the airport, stating that he was going to need to see Mocek's I.D. or else he was going to arrest Mocek for concealing identity.") (emphasis added). Because the Complaint demonstrates that the individual TSOs did not make the decision to arrest Mocek, search him or his belongings, file criminal charges against him, or request that any of the above occur; their actions did not cause Mocek to suffer the injuries he complains of in paragraph 93 of the Complaint. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676-677 (2011) (holding that because the government official may only be held personally liable under *Bivens* "for his or her own misconduct," the plaintiff must allege that "each Government-official defendant, through the official's own individual actions, has violated the Constitution").

The Third Circuit recently considered similar allegations against TSOs at an airport security checkpoint. *See George v. Rehiel*, 738 F. 3d 562

(3rd Cir. 2013).[12]  In that case the plaintiff also alleged that both his First and

Fourth Amendment rights were violated when TSOs questioned him and he

was detained by local police.  *Id*.  Specifically, the plaintiff alleged that after

the TSOs discovered Arabic-language flash cards that included words such as

bomb, terrorist, explosion, attack, kill and kidnap, he was taken to another

screening area for approximately 30 minutes where his carry-on items were

searched, his cell phone swabbed for explosives and a TSA supervisor

contacted.  *Id.* at 567.  Plaintiff claimed that upon her arrival, the supervisor

"subjected him to aggressive interrogation and detained him for an additional

15 minutes."  *Id.*  During questioning "of the plaintiff, a Philadelphia Police

officer arrived at the airport screening area, immediately handcuffed [the

plaintiff] and led him through the terminal . . . to the Airport Police Station"

where "he was locked in a cell for more than four hours."  *Id.* at 568.

---

[12]  The Eighth Circuit also considered similar facts in a less sensitive forum
than an airport passenger screening checkpoint. *See Green v. Nocciero*, 676
F.3d 748 (8th Cir. 2012). In that case, the Director of Security for a school
system told police that a member of the audience at a school board meeting
was "disruptive and refused to leave." *Id.* at 753. The audience member,
Green, denied being disruptive, but when the police arrived he "refused *their*
request" to leave and was arrested based on refusing this order of the police.
*Id.* Because the arrest was based on Green's refusal to obey the police order,
the Eighth Circuit affirmed the dismissal of his First Amendment retaliation
claim, finding the "sequence fails to show a sufficient causal connection
between the actions" of the Director of Security and "Green's subsequent
arrest and prosecution." *Id.*

In denying both the First and Fourth Amendment claims, the Third Circuit indicated "absent something on the record to the contrary, it seems just as likely that police officers who are summoned by TSA Officials would use their own independent discretion to determine whether there are sufficient grounds to take someone into custody." *Id.* at 583. In this case, it is much more likely that the police used their independent discretion to arrest Mocek because the record actually indicates that the police did not initially plan on arresting the plaintiff, and only did so after he refused several requests to provide identification.

Mocek relies heavily on another case involving TSA, *Tobey v. Jones*, 706 F.3d 379 (4th Cir. 2013) to support his First Amendment claim. Appellants Brief at 30-31. However, *Tobey* is distinguishable and was in any event wrongly decided. Unlike Mocek, *Tobey* "present[ed] his boarding pass and identification to the TSA pre-screening agent," but he made his displeasure with being sent to a scanning unit for enhanced screening known by removing all but his "running shorts and socks, revealing the text of the Fourth Amendment written on his chest." 706 F.3d at 383-84. A TSA agent advised Tobey that he did not have to remove his clothes, but Tobey responded that "he wished to express his view that TSA's enhanced screening procedures were unconstitutional." *Id.* at 384.

*Tobey* is readily distinguishable from this case is because Tobey expressed his views to TSA officials that the screening process was unconstitutional. *Id.* Immediately after this assertion, "Appellants engaged RIC police officers to arrest him." *Id.* at 387. Unlike this case, *Tobey* involved allegations of viewpoint discrimination. *Id.* at 391. ("Therefore, in a nonpublic forum such as an airport, a government official cannot suppress expression merely because [they] oppose the speakers view.") (internal quotation and citation omitted). In addition, the Fourth Circuit credited "Tobey's allegations that Appellants arrested or caused him to be arrested without probable cause." *Id.* at 392. However, in this case, as the district court found, there was probable cause for the Mocek's arrest. App. at 238-245.

As the Third Circuit pointed out, a major mistake in *Tobey* involved the Fourth Circuit's conclusion that merely reporting a person to the police is enough to be liable for a subsequent arrest. *George*, 738 F.3d 583 ("We disagree with the *Tobey* majority's conclusion that '[i]t is an undoubtedly natural consequence of reporting a person to the police that a person will be arrested.'"). The court in *George*, pointed out that this conclusion did not appear to have any basis in the record and it was just as likely that the police officers used their own independent discretion to determine they had a

sufficient basis to arrest. *Id.* But even if there were facts in the *Tobey* complaint supporting the Fourth Circuit's conclusion there, in this case the facts pled by Mocek specifically indicate that the AAPD officers used their independent discretion to determine that there was probable cause to arrest Mocek. Mocek's own factual allegations make it clear that the police did not initially intend to arrest the plaintiff. App. at 19. The Complaint also indicates that Officer Dilley "changed his mind" and decided to arrest Mocek after the police made several unsuccessful attempts to obtain his identification. *Id.* Therefore, it is clear that the TSOs did not cause Mocek's arrest.

Even had Mocek pled facts indicating that the TSOs' request for assistance somehow caused Mocek's arrest, settled law in this Circuit would require Mocek also to plead and prove the absence of probable cause supporting his arrest and prosecution. *See McBeth v. Himes*, 598 F.3d 708, 719 (10th Cir. 2010) citing *Hartman v. Moore*, 547 U.S. 250 (2006). In *Hartman* the Court required a plaintiff acquitted in a federal fraud prosecution to plead and prove the absence of probable cause supporting the prosecution to succeed on a claim for retaliatory prosecution. 547 U.S. at 265-66. This Court applied the same requirement in *McBeth* because the "claim possesses a distinct body of highly relevant evidence (i.e. evidence of

probable cause) that is 'apt to prove or disprove retaliatory causation,' and second, the more complex causation involved when the retaliator brings about the injury through the acts of a third party." *McBeth*, 598 F.3d at 719, quoting *Hartman*, 547 U.S. at 261-62.

*McBeth* extended the *Hartman* analysis outside the context of retaliatory prosecution in circumstances when the defendant who allegedly acted with retaliatory animus is not the same person who caused the plaintiff's injury. *Id.* The plaintiff in *McBeth* was a home daycare operator who brought a First Amendment retaliation claim against a police officer who informed the Colorado Department of Human Services (CDHS) that plaintiff's son, who lived with her, had been accused of molesting children. *Id.* at 712. Plaintiff claimed that the police officer contacted CDHS in retaliation for the plaintiff exercising her First Amendment right to consult with an attorney. *Id.* at 714. Plaintiff then alleged that CDHS threatened to suspend her daycare license and coerced her into relinquishing the license. *Id.* at 717. This Court dismissed the First Amendment retaliation claim against the police officer because the plaintiff failed to allege that the CDHS officials lacked cause to seek suspension of her license. *Id.* at 720.

Here, as in *Hartman* and *McBeth*, the allegation is that the officials alleged to harbor retaliatory motive (the TSOs) induced third parties (the

AAPD officers) to arrest. And, as in *Hartman* and *McBeth*, there is "a distinct body of highly relevant evidence (i.e. evidence of probable cause) that is 'apt to prove or disprove retaliatory causation.'" *McBeth*, 598 F.3d at 719 (quoting *Hartman*, 547 U.S. at 261-62). Accordingly, Mocek must demonstrate a lack of probable cause for his arrest. However, as the district court made clear, the AAPD officers did have probable cause for Mocek's arrest. *See also* section I(B)(1), *infra*. Therefore, Mocek cannot prove the causation element of his First Amendment retaliation claim because he has failed to bridge the gap between the alleged retaliatory animus of the TSOs, and the conduct of the AAPD officers, who took the adverse action. *See McBeth*, 598 F.3d at 720.

### 3. Mocek Also Failed to Plausibly Plead that the TSOs Acted With A Retaliatory Motive.

Although Mocek alleges that the TSOs requested assistance because he was filming the additional screening process, a more plausible explanation, based on the facts in the Complaint, is that the local police were contacted because Mocek was creating a disturbance and his behavior raised potential security concerns. See section I(A)(1)(b), *supra*; App. at 240-242; *see also American Dental Ass'n. v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) ("Importantly, the Court held in *Iqbal*, as it had in *Twombly*, that courts may infer from the factual allegations in the complaint obvious

alternative explanation[s], which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer.") (internal quotations marks omitted). As indicated earlier, Mocek's rejection of TSA procedures concerning producing identification, and his refusal to stop filming additional screening procedures ultimately required the attention of at least three additional TSA employees who could have been performing other duties.

Likewise, based on Mocek's behavior, a TSO could not responsibly assume that Mocek was neither attempting to evade the security system nor testing the system responses for future operations.  In addition, TSOs must be concerned about the recording of procedures and publicizing possible vulnerabilities for others who aspire to evade security procedures, including the implementation of the TSA's watch list matching program. Therefore, it is more plausible that the TSOs requested police assistance based on concerns about security, distraction and disruption, rather than based on any retaliatory animus.

### 4.  Mocek's Has Not Pled A Violation of Clearly Established Law Under The First Amendment.

Mocek's First Amendment retaliation claims against the TSOs are also barred because the rights he claims were violated are not clearly established.  To overcome an assertion of qualified immunity, a plaintiff

pleading the violation of a constitutional right must show not only that the right existed and was violated, but that the right was clearly established in the specific factual circumstances.  If the plaintiff's allegations fail to state a claim of violation of clearly established law, "a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell*, 472 U.S. at 526 (internal citation omitted).

For purposes of qualified immunity, a right must be clearly established at the time the alleged violation occurred. *See Wilson v. Layne*, 526 U.S. 603, 604 (1999) ("the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.")  Specifically, the plaintiff must point to case law in a similar context that clearly established the right in question.  *See Saucier v. Katz*, 533 U.S.194, 209 (2001) (a right cannot be clearly established if no case demonstrates a clearly established rule "prohibiting [a law enforcement officer] from acting as he did."). The Tenth Circuit has explained that, for a right to be clearly established, "ordinarily . . . there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Zia Trust Co. ex rel. Causey v. Montoya*, 597 F.3d 1150, 1155 (10th Cir. 2010) (internal quotation and citation omitted).  Although there

37

does not need to be "a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011). In short, courts should not "define clearly established law at a high level of generality." *Id.* at 2084.

If officers of reasonable competence could disagree on the issue, a right is not clearly established. *Malley v. Briggs*, 475 U.S. 335, 341 (1986) "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *al-Kidd*, 131 S. Ct. at 2085 (*quoting Malley*, 475 U.S. at 341). Even if the officer's conduct is later deemed unlawful, the officer is nevertheless entitled to qualified immunity if the officer made an objectively reasonable decision. *Hunter*, 502 U.S. at 227. Finally, that an official's conduct violates some other source of law, such as regulations, manual provisions, or state law, does not automatically strip the officer of qualified immunity. *Davis* v. *Sherer*, 468 U.S. 183, 193-96 (1984).

The district court was correct in finding that "neither the Tenth Circuit nor the Supreme Court has found that Mocek's right to gather news in this context [at an airport screening checkpoint] is clearly established." App. at 232. There is no case law directly addressing the factual scenario facing the

three TSOs. That Mocek points to no cases in any court that have addressed his allegation that he had a constitutionally protected right to gather news at a TSA passenger screening checkpoint is itself a clear indication that the right is not clearly established. *See also Smith v. Plati*, 258 F.3d at 1178 (noting that it is "well-settled that there is no general First Amendment right of access to all sources of information within governmental control").

In addition, the Supreme Court has stated (in a case arising out of a Tenth Circuit decision) that "[t]his Court has never recognized a First Amendment right to be free from a retaliatory arrest that is supported by probable cause."[13] *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012). As the Court recognized, "[a]t the time of Howard's arrest, *Hartman's* impact on the Tenth Circuit's precedent governing retaliatory arrests was far from clear. Although the facts of *Hartman* involved only a retaliatory prosecution, reasonable officers could have questioned whether the rule of *Hartman* also applied to arrests." 132 S. Ct. at 2095. The Court reasoned that "*Hartman*

---

[13]  Indeed, the Supreme Court has not extended *Bivens* implied causes of action to First Amendment claims. *See Iqbal*, 556 U.S. 675 ("Because implied causes of action are disfavored, the Court has been reluctant to extend *Bivens* liability to any new context or new category of defendants . . . . Indeed, we have declined to extend *Bivens* liability to a claim sounding in the First Amendment.") (internal quotations and citations omitted). The Court continues to indicate that it has not decided this issue. *See Wood v. Moss*, 134 S. Ct. 2056, 2066 (2014) ("[W]e have several times assumed without deciding that *Bivens* extends to First Amendment claims, . . .. We do so again in this case." (internal citation omitted)).

was decided against a legal backdrop that treated retaliatory arrest and prosecution claims similarly." *Id.* at 2095. Therefore, "[a] reasonable official also could have interpreted *Hartman's* rationale to apply to retaliatory arrests." *Id.* Thus, the defendants were entitled to qualified immunity in a First Amendment retaliation case that resulted in an arrest supported by probable cause. *Id.* at 2097. Likewise, when Mocek was arrested, it was not clearly established in this Circuit "that an arrest supported by probable cause could give rise to a First Amendment violation."[14]  *Id.*

Mocek responds by pointing out that other circuits have held that "recording police officers and public officials in the course of carrying out their duties is directly protected by the First Amendment."  Appellant's Brief at 39. However, these cases are factually and legally distinguishable because they involve the recording of law enforcement officers, which the TSOs are not, and doing so in a public forum, which an airport screening checkpoint is not. Moreover, even if the airport screening checkpoint were a public forum, the TSOs' request for Mocek to cease recording was a reasonable limitation as to the time, place, and manner of any expressive conduct. *See* section I(A)(1) *supra*.

---

[14]  As indicated by the facts as pled in the Complaint, and as analyzed by the district court, there was probable cause to arrest Mocek for failing to provide his identification.  See section I(B)(1), *infra* and App. at 238-245.

"Additionally, neither the Tenth Circuit nor the Supreme Court has recognized such a right, and the weight of authority from other circuits has not found the law to be as Mocek maintains." App. at 233. In *Kelly v. Borough of Carlisle*, the Third Circuit held that there was not a clearly established right to videotape police officers during a traffic stop. 622 F.3d at 251, 262. *See also Szymecki*, 353 F. App'x. at 853 ("right to record police activities on public property was not clearly established in this circuit at the time of the alleged conduct"). In finding that the right was not clearly established, the Third Circuit noted that the unique safety concerns raised at a traffic stop distinguished the facts of that case from others in which safety concerns were not an issue.  *Kelly*, 622 F.3d at 262-63.

Similarly, recording TSOs at a screening checkpoint raises security concerns because of the potential that Mocek was either trying to cause a distraction to allow others to evade the system or recording the process to determine its vulnerabilities, both of which could compromise the security of the transportation system. Therefore, to the extent that the filming of police activity in a public forum is analogous to this case, Mocek's conduct is more like that of the plaintiff in *Kelly*, who did not have a clearly established right to record police while stopped for a traffic infraction, which is an inherently dangerous situation. 622 F.3d at 262. The claims in this case are thus distinct

41

from *Glik*, where the First Circuit found a clearly established right to record police officers from a distance in a public park, without interfering with their duties.[15]

In finding a right to film police activity in a public forum, the First Circuit recognized that there may be a split in circuits. *Glik*, 655 F.3d at 85.[16] In the absence of any Tenth Circuit authority, a TSO could not reasonably be expected to know whether his or her conduct in preventing a passenger, who willfully refused to comply with TSA procedures, from filming the additional screening process at a passenger screening checkpoint, a non-public forum, violated the First Amendment. That there is disagreement among judges makes it clear that qualified immunity on

---

[15]  The First Circuit's decision in *Glik* distinguished the facts before it from the traffic stop in *Kelly*, noting that "a traffic stop is worlds apart from an arrest on the Boston Common" which it described as the "apotheosis of a public forum." 655 F.3d at 85.

[16] *Glik* was decided after the date of Mocek's allegations, and therefore, even if there was not a split in the circuits, could not have provided the TSOs with guidance concerning clearly established law.  Cases post-dating the challenged conduct are only relevant to the issue of qualified immunity if they reflect the "uncertain state of the law" at the relevant point in time. *Bame v. Dillard*, 637 F.3d 380, 387-8 (D.C. Cir. 2011); s*ee also Anderson*, 483 U.S. at 641 (courts examine the state of the law at the relevant time); *Brousseau v. Haugen*, 543 U.S. 194, 198 (2004) ("Because the focus is on whether the officer had fair notice that [his] conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct.")

Mocek's First Amendment claim is appropriate for the TSOs. *See Wilson*, 526 U.S. at 618.

### B.  Mocek's Allegations Do Not Establish That The TSOs Violated His Clearly Established Rights Under The Fourth Amendment.

### 1.  Mocek's Allegations Fail to Allege a Fourth Amendment Violation by the TSOs.

Mocek's allegations fail to state a Fourth Amendment violation by the TSOs for two reasons.  First, Mocek's recitation of the facts does not allege that the TSOs personally participated in or directed the police defendants in this case to arrest Mocek or to search and seize his belongings.[17] Therefore, the TSOs were not the proximate cause of Mocek's alleged Fourth Amendment violations.  Second, as indicated by the district court, the AAPD officers had probable cause to arrest Mocek.  Therefore, there was no Fourth Amendment violation. See App. at 238-45.

Mocek claims "[i]t was incompetent for the Federal Defendants to summon the City Defendants and illegally demand that Mocek stop filming, which led to his arrest and prosecution." Appellant's Brief at 51-2. Under Mocek's theory of causation, anyone who contacts the police is then

---

[17] Mocek's Count III alleges that the TSOs "summoning [of] law enforcement, resulting in subjecting him to excessive force, searching his person, seizing and searching his camera and memory contained therein, and attempting to destroy evidence by deleting the contents of the camera" violated his Fourth Amendment rights. App. at 30.

responsible for allegations of subsequent police misconduct. However, the Supreme Court has made it clear that in a *Bivens* case, personal participation in the alleged misconduct is necessary, as "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677. Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 676. The Complaint here establishes that the decision to arrest Mocek was the AAPD officers' alone and that this decision did not rest on any misinformation provided by the TSOs. See section I(A)(1)(a), *supra.*

The Complaint does not allege that the TSOs were involved in the decision to arrest Mocek or that Mocek was arrested for video recording the TSA security screening process. On the contrary, the Complaint supports the TSOs' position that they were not involved in the decision to arrest Mocek. App. at 19. In addition, Mocek's own brief acknowledges that "[t]he TSA defendants did not ask the City defendants that Mocek be arrested." Appellant's Brief at 42. The complaint indicates that the sole reason for Mocek's initial arrest was because he refused to comply with the police request for his identification. App. 19. Because the Complaint does not allege that the TSOs were involved in the decision to arrest Mocek or that he

was arrested for video recording the TSA security screening process, the Complaint fails to state a Fourth Amendment claim.

The Third Circuit in *George* found no Fourth Amendment violation under similar circumstances. There, TSOs were accused of summoning members of the Philadelphia Police Department which resulted in the plaintiff's arrest and prolonged detention. 738 F.3d at 580. The court disagreed with the contention that it "is an undoubtedly natural consequence of reporting a person to the police that a person will be arrested."[18] *George*, 738 F.3d at 583. The court indicated that "absent something on the record to the contrary, it appears just as likely that police officers who are summoned by TSA officials would use their own independent discretion to determine whether there are sufficient grounds to take someone into custody." *Id.* In this case the facts pled by Mocek specifically indicate that the AAPD officers used their independent discretion to determine that there was probable cause to arrest Mocek. Mocek's own factual allegations make it clear that the police did not initially intend to arrest the plaintiff. App. at 19.

---

[18] Dean Prosser observed that in order to hold a defendant responsible for an arrest made by a law enforcement officer, "the defendant must have taken some active part in bringing about the unlawful arrest itself . . . .There is no liability for merely giving information to legal authorities, who are left entirely free to use their own judgment." William L. Prosser, *Law of Torts*, 47 (4th ed.1971).

The Complaint also indicates that Officer Dilley "changed his mind" and decided to arrest the plaintiff after the police made several attempts to obtain Mocek's identification. *Id.* Therefore, it is clear that the TSOs did not cause Mocek's arrest.[19]

Even had the TSOs somehow caused Mocek's arrest, there is no Fourth Amendment violation because the AAPD officers had probable cause to arrest Mocek. Mocek pled that he did not comply with Officer Dilley's request to produce identification when Dilley informed him that he "was now a part of a criminal investigation." App. at 19. Mocek initially indicated that he did not have identification, but ultimately responded to a request for his identification by stating "he was going to remain silent and that he

---

[19]   Put another way, while the TSOs may have been the "but for" cause of Mocek's interaction with the AAPD officers, they did not proximately cause his arrest. *See James v. Chavez*, 511 F. App'x 742, 747 (10th Cir. 2013) (unpublished) ("under basic principles of tort law, their [defendants'] liability is limited to the harm 'proximately' or 'legally' caused by their tortious conduct".)  In this case, the TSO's conduct was reasonable, not tortious, and as indicated above, it was the plaintiff's conduct in refusing to provide identification, which caused his arrest. *See id.* at 748 ("wrongful actions by the victims of constitutional torts can, in the proper circumstances, constitute superseding causes to defeat liability.")  *See also Wilcox v. Homestake Mining Co.*, 619 F.3d 1165, 1167 (10th Cir. 2010) ("New Mexico courts have indicated that a tort plaintiff must demonstrate there is a chain of causation initiated by some negligent act or omission of the defendant.") (internal quotation omitted.)

wanted to talk to an attorney." *Id.*[20] Under New Mexico law, the misdemeanor offense of concealing identity is described as follows:

> Concealing identity consists of concealing one's true name or identity, or disguising oneself with intent to obstruct the due execution of the law or with intent to intimidate, hinder or interrupt any public officer or any other person in a legal performance of his duty or the exercise of his rights under the laws of the United States or of this state.

N.M. Stat. Ann. 1978 § 30-22-3.

To arrest for concealing identity, there must be reasonable suspicion of some predicate, underlying crime. *See Brown v. Texas*, 443 U.S. 47, 52 (1979) (observing that whatever purposes may be served by "demanding identification from an individual without any specific basis for believing he is involved in criminal activity, the guarantees of the Fourth Amendment do not allow it.") For reasonable suspicion to exist, an officer "need not rule out the possibility of innocent conduct;" the officer must simply possess "some minimal level of objective justification" for making the stop. *United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004). This standard is met

---

[20] Mocek's contention that he did not refuse to provide identification or that he provided his identification to the TSOs by providing his boarding pass is contradicted by his own Complaint. Appellant's Brief at 44. Mocek admits that he has refused to provide identification at TSA screening checkpoints in the past, planned to refuse to provide identification during the incident in question and when requested to provide identification "stated that he would not provide anything because it was his belief that he was not required to." App. at 17.

by information falling considerably short of a preponderance standard. *United States v. Wardlow*, 528 U.S. 119, 123 (2000) (noting that "reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence"). In addition, for reasonable suspicion to exist, officers are not required "to observe the equivalent of direct evidence of a particular specific crime" as long as "there is reasonable suspicion of criminal activity." *United States v. Pack*, 612 F.3d 341, 357 (5th Cir. 2010).

In this case, Mocek alleges that when the AAPD officers arrived at the security checkpoint, unidentified TSOs indicated that Mocek was "causing a disturbance," "won't put his camera down" and was "taking pictures of all of us."[21] App. at 18-19. The AAPD officers observed Mocek continue to record despite the requests of the TSOs which resulted in the AAPD officers also requesting that Mocek cease his filming. *Id.* at 19. Instead of complying with this request, Mocek continued recording and stated "I've checked into it and I know that I *can* do it here." *Id.* Mocek was then provided with several opportunities to provide his identification. *Id.* He was also told that he was

---

[21] As indicated earlier, the TSOs had a valid basis for indicating that Mocek was causing a disturbance. See section I(A)(1)(a), *supra.* Safety concerns over Mocek's behavior of first refusing to provide his identification and then recording the additional screening process used in such an instance resulted in several TSOs diverting their attention from other duties to deal with this potential security risk.

part of a criminal investigation and that he could be arrested for concealing his identity. *Id.* Instead of complying with the AAPD Officers, Mocek asked what he was being investigated for, to which Officer Dilley replied "disturbing the peace." *Id*. Mocek denied that he was disturbing the peace and indicated that "he was going to remain silent and that he wanted to talk to an attorney." *Id.*

Although police officers have "no obligation to articulate a specific offense which they believe" Mocek committed for their suspicion to have been reasonable, Officer Dilley did state one possibility, disturbing the peace. *United States v. Harmon*, 871 F. Supp. 2d 1125, 1160 n.7 (D.N.M. 2012) *aff'd* 742 F.3d 451 (10th Cir. 2014). Under New Mexico law this offense requires that a person was "engaging in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct which tends to disturb the peace." N.M. Stat. Ann. 1978 § 30-20-1. Based on the information provided by the TSOs about Mocek's behavior, and the behavior they witnessed, the AAPD officers had a reasonable suspicion that Mocek's behavior may have been "otherwise disorderly," and was a potential security threat to the screening checkpoint. Therefore, the AAPD officers could legally demand that Mocek produce identification. See App. at 19 ("One of the officers said that Mocek was causing a commotion.")

Mocek's failure to provide identification gave the AAPD officers probable cause to arrest him and conduct a lawful search incident to arrest. *See United States v. Torres-Castro*, 470 F.3d 992, 998 (10th Cir. 2006) ("The primary factor for determining whether a search is incident to an arrest is the time between the search and the actual arrest."); *see also* App. at 20. (Mocek was arrested, walked across the airport to the AAPD office and then his belongings were searched).

Therefore, Mocek has not stated a violation by the TSOs of his Fourth Amendment right to be free from unreasonable search and seizure. Because Mocek has failed to allege a Fourth Amendment violation, qualified immunity was properly granted to the TSOs on that count.

### 2. Mocek's Allegations Do Not Constitute a Violation of Clearly Established Law Under the Fourth Amendment.

The TSOs are also entitled to qualified immunity because the only purported Fourth Amendment right cited by Mocek - to be free from TSOs "summoning law enforcement" when a person intentionally challenges TSA rules that require passengers provide identification and then videotaping TSA's additional screening procedures at a passenger screening checkpoint - is not clearly established. *See* App. at 30. To the contrary, to the extent that the parameters of a domestic airline traveler's Fourth Amendment rights are

50

clearly established, it is clear that the actions taken by the TSOs fell well-within the boundaries of acceptable and constitutional behavior.

In Fourth Amendment analysis, an area of law in which "the result depends very much on the facts of each case," an officer cannot have fair notice if the extant cases do not "squarely govern." *Brousseau*, 543 U.S. at 201; *see also Saucier,* 533 U.S. at 205 (acknowledging that it is often "difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts.") The Fourth Amendment theory put forth by Mocek, that government employees who are not law enforcement officers can be liable for merely summoning law enforcement at an airport passenger screening checkpoint, has not been squarely addressed in Supreme Court or Tenth Circuit case law.  In addition, as indicated *supra*, there appears to be a split in the circuits that have considered somewhat similar issues. *See George*, 738 F.3d at 583 ("We disagree with the *Tobey* majority's conclusion that '[i]t is an undoubtedly natural consequence of reporting a person to the police that the person will be arrested.'") quoting *Tobey*, 706 F.3d at 386.[22]  "If judges thus disagree on a constitutional question, it is unfair to subject police to money damages for

---

[22]  As indicate in footnote 16, *supra*, cases like *Tobey* that post-date the challenged conduct are only relevant to the issue of qualified immunity if they reflect the "uncertain state of the law" at the relevant point in time. *Bame*, 637 F.3d at 387-88.

picking the losing side of the controversy." *Wilson*, 526 U.S. at 618; s*ee also Cruz v. City of Laramie, Wyo.*, 239 F.3d 1183, 1189-90 (10th Cir. 2001) (finding, in light of a split in circuits, the arrestee had not demonstrated a clearly established right).

As indicated by the district court, the TSOs' conduct is factually distinguishable from that of defendants whom the Tenth Circuit has determined may be liable in a nonsupervisory capacity for constitutional violations others commit. App. at 248. Unlike this case, the Tenth Circuit has found nonsupervisory defendants liable for constitutional violations committed by others where the defendants' initial action was itself tortious or in violation of the law. *See Trask v. Franco*, 446 F.3d 1036, 1046 (10th Cir. 2006) (finding that probation officers may be liable for the constitutional violations caused by their unlawful search of the plaintiff's residence); *Martinez v. Carson*, 697 F.3d 1252, 1255 (10th Cir. 2012) (holding that Department of Corrections employees could be liable for the constitutional violations the police committed because the Corrections employees illegally detained the plaintiffs before transferring them to the police.) Therefore, the chain of causation leading to any alleged injury which Mocek suffered can only be initiated if the TSOs' initial conduct was itself "some negligent act or omission." *Wilcox*, 619 F.3d at 1167.

However, the TSOs' conduct leading up to their request for police assistance was not wrongful. Based on the totality of the circumstances, including the facts that the incident took place at an airport passenger screening checkpoint, security concerns were increased by Mocek's refusal to provide identification, coupled with his efforts to record additional screening procedures and his willful conduct ignoring the TSO requests to stop filming, the TSO request for police assistance was reasonable. Therefore, *Trask* and *Martinez* are both factually and legally distinct from this case, and do not provided clearly established law that is applicable here. *See Saucier*, 533 U.S. at 209 (a right cannot be clearly established if no case demonstrates a clearly established rule "prohibiting [a law enforcement officer] from acting as he did.").

## II. THE DISTRICT COURT CORRECTLY DENIED MOCEK'S REQUEST FOR DECLARATORY RELIEF

Mocek is not entitled to any declaratory relief because he has not suffered the deprivation of any cognizable right. In addition, to the extent he is seeking declaratory relief against the TSOs in their official capacity, Mocek has failed to state a proper jurisdictional basis.[23] "There must be an independent basis of jurisdiction, under statutes equally applicable to actions

---

[23] "[T]he real party in interest in an official-capacity suit is the governmental entity and not the named official." *Hafner v. Melo*, 502 U.S. 21, 25 (1991).

for coercive relief, before a federal court may entertain a declaratory-judgment action." 10B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2766 (3d ed. 2012). However, Mocek has failed to provide any independent basis for declaratory relief against the United States. Therefore, his request for declaratory relief was properly denied.

Paragraph twelve of the Complaint does not provide a basis for jurisdiction. *See* Wright and Miller § 2766 ("If the court would lack jurisdiction of a coercive action against the United States because of sovereign immunity, it is equally without jurisdiction of a declaratory action against the United States.") These assertions of jurisdiction other than the Declaratory Judgment Act, include 28 U.S.C. §§ 1331, 1332 and 1343. However, the federal courts lack subject matter jurisdiction over claims against the United States for which it has not waived sovereign immunity. *Iowa Tribe of Kan. & Neb. v. Salazar*, 607 F.3d 1225, 1232 (10th Cir. 2010); *Atkinson v. O'Neill*, 867 F.2d 589, 590 (10th Cir. 1989) ("It is well settled that the United States and its employees, sued in their official capacities, are immune from suit, unless sovereign immunity has been waived.").

Specifically, the grants of jurisdiction in 28 U.S.C. §§ 1331 and 1332 require an accompanying waiver of sovereign immunity. *See Merida Delgado v. Gonzales*, 428 F.3d 916, 919 (10th Cir. 2005) ("[D]istrict court

54

jurisdiction cannot be based on § 1331 unless some other statute waives sovereign immunity.") (internal quotation and citation omitted); *General Ry. Signal Co. v. Corcoran*, 921 F.2d 700, 703 (7th Cir. 1991) ("United States is not a citizen for diversity purposes . . . agencies of the United States likewise cannot be sued in diversity.") Likewise, the Tenth Circuit has held that 28 U.S.C. § 1343(a) (4) does not waive the United States' sovereign immunity. *Trackwell v. United States Government*, 472 F.3d 1242, 1244 (10th Cir. 2007).[24]

"Because the jurisdiction of federal courts is limited, there is a presumption against our jurisdiction, and the party invoking federal jurisdiction bears the burden of proof." *Marcus v. Kan. Dep't of Revenue*, 170 F.3d 1305, 1309 (10th Cir. 1999) (internal quotation and citation omitted); *see also Bork v. Carroll*, 449 F. App'x. 719, 721 (10th Cir. 2011) (unpublished) ("It is, after all, the job of the courts only to pass on the

---

[24]  Nor do Mocek's claims for damages relief found in paragraph eleven of the Complaint provide jurisdiction for this equitable claim.  The United States has not waived its sovereign immunity for constitutional torts claims. *F.D.I.C. v. Meyer*, 510 U.S. 471, 477 (1994).  Sovereign immunity also bars an action under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971) against a federal employee in his or her official capacity.  *See Farmer v. Perrill*, 275 F.3d 958, 963 (10th Cir. 2001) ("There is no such animal as a *Bivens* suit against a public official tortfeasor in his or her official capacity.").  Finally, 42 U.S.C. § 1983 applies only to actions by state and local entities, not by the federal government.  *Dry v. United States,* 235 F.3d 1249, 1255 (10th Cir. 2000).

theories asserting jurisdiction the litigants advance, not to conjure other possibilities".) Mocek failed to state a jurisdictional basis for his declaratory relief claim against the federal defendants in their official capacities. This Court need not resolve "[w]hether there might be some *other* way someone in [plaintiff's] shoes could invoke the jurisdiction of the federal courts." *Bork*, 449 F. App'x at 721. As in *Bork*, Mocek did not "rely[] on the APA's waiver of sovereign immunity, or on an exception to federal sovereign immunity." (citation omitted). Therefore, this claim was properly dismissed.

Even had Mocek stated a proper jurisdictional basis, he lacks standing for his declaratory relief claim. "The plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102-03 (1983) (internal quotations and citations omitted). As indicated by the district court, the plaintiff has not sustained any cognizable injury.  In addition, there is no real and immediate threat of injury.  *See Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 730 (2013) ("[W]e have never held that a plaintiff has standing to pursue declaratory relief merely on the basis of being 'once bitten.'").

Mocek does not claim standing based on a likelihood of recurrence, but instead argues that the "chilling effect" on his free speech is sufficient for standing purposes. Appellant's Brief at 53.  However, to the extent any of Mocek's activities were protected by the First Amendment, any such protection is not without limits, and any actions taken by the TSOs with respect to Mocek were reasonable. *See* section I(A)(1)(a), *supra*. Therefore, Mocek also lacks standing for his declaratory relief claims against the TSOs in their official capacity.

## III. MOCEK'S REQUEST TO AMEND HIS COMPLAINT IS IMPROPER

Mocek provides no legal support for his request that this Court allow him to amend his Complaint.  *See* 6A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 1489 (3rd ed. 2014) ("Amendments to the original pleadings generally may not be made once the suit has reached the appellate level.") This is not an appeal from a denial of a request to amend.  Mocek requested leave to amendment his Complaint in conjunction with his opposition to the AAPD officer's motion to dismiss. The district court considered the amendments, effectively granting leave to amend, "despite Mocek's improper procedure in attempting to amend the Complaint." App. at 511-513.

In addition, Mocek has not made clear what any further amendments would entail or if they would include any additional allegations concerning the TSOs, or would be limited instead to the AAPD officers.  Although Mocek requests to "amend the complaint to include additional facts, as discussed above," with the exception of offering to provide Mocek's transcript of his recording at the TSA security checkpoint, there is no indication what those additional facts are. Nor has Mocek identified any way in which amended allegations could overcome the district court's decision dismissing his claims. Mocek has not provided any proposed amendment or any notice of the basis of the proposed amendment. Therefore, Mocek has provided no legal or factual justification for his request that the Tenth Circuit provide him with leave to amend his Complaint. *See Calderon v. Kansas Dept. of Social & Rehab Serv*., 181 F.3d 1180, 1186-87 (10th Cir. 1999) ("By requiring notice to the court and the opposing party of the basis for the motion, [Fed.R.Civ.P.] rule 7(b)(1) advances the policies of reducing prejudice to either party and assuring the court can comprehend the basis of the motion and deal with it fairly.") (internal quotation marks and citations omitted). This "requirement of notice merely assures that we do not require district courts to engage in independent research or read the minds of litigants to determine if information justifying an amendment exists." *Id.* at

1187 (internal quotations marks and citation omitted). *See also Hall v. Witteman*, 584 F.3d 859, 868 (10th Cir. 2009) (the plaintiff "nowhere explained how a proposed amendment would cure the deficiencies identified by the district court.")

## IV. THERE IS NO JUSTIFICATION FOR MOCEK'S REQUEST FOR A NEW DISTRICT COURT JUDGE

Mocek also provides no legal or factual justification for his request for the appointment of a new judge. Reassignment of a case involves an "extraordinary" step. *Procter & Gamble Co. v. Haugen*, 427 F.3d 727, 744 (10th Cir. 2005). This Court takes this extraordinary step only in limited circumstances: (1) when there is evidence of actual bias or prejudice against a party, or (2) on the basis of a three-part approach:

> (1) Whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*Michell v. Maynard*, 80 F.3d 1433, 1450 (10th Cir. 1996) (quoting *United States v. Sears, Roebuck & Co.*, 785 F.2d 777, 780 (9th Cir. 1986).

Mocek has not alleged personal bias or any facts suggesting a need for reassignment based on the three-part test. Therefore, in the unlikely

event of a remand in this case, Mocek's request for the appointment of a new district court judge should be denied.

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted,

Joyce R. Branda
  Acting Assistant Attorney General

Damon Martinez
  United States Attorney

Rupa Bhattacharyya
  Director, Torts Branch
Andrea W. McCarthy
  Senior Trial Counsel
H. Thomas Byron III
  Appeals Counsel

/s/ Edward J. Martin
Edward J. Martin
Senior Trial Attorney, Torts Branch,
Civil Division
United States Department of Justice
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044
Tel: 202-616-1024

## STATEMENT REGARDING ORAL ARGUMENT

Oral Argument is not necessary in this appeal because the issues were fully considered in the district court's opinion and addressed in the briefs on appeal. However, if the Court feels it would benefit from oral argument, the individual federal appellees stand ready to present argument.

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

I certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font.

I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13665 words, excluding the parts of the brief exempted under Rule 32(a)(7)(B)(iii), according to the count of Microsoft Word.


November 10, 2014                    /s/ Edward J. Martin
                                     EDWARD J. MARTIN

## CERTIFICATE OF DIGITAL SUBMISSION

I certify that:

1.  All required privacy redactions have been made.

2.  The hard copies to be submitted will be exact copies of the

    electronically filed version of this brief.

3.  This brief was scanned for viruses using the following software:

    Microsoft Forefront Endpoint Protection 2010
    Virus definition version 1.163192.0
    Updated 11/20/2013


November 10, 2014                    /s/ Edward J. Martin
                                     EDWARD J. MARTIN

## CERTIFICATE OF SERVICE

I certify that on November 10, 2014, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system. The participants in this case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system and e-mail.


November 10, 2014                          /s/ Edward J. Martin
                                           EDWARD J. MARTIN